**FILED - GR**
August 12, 2022 3:16 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: MKC  SCANNED BY: JW /8-16

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**In re: W. S. Spencer**          **Case No.**    **1:22-cv-737**
**Paul L. Maloney**
**United States District Judge**

## -- JURY DEMANDED FOR ALL APPLICABLE CLAIMS --

# HYBRID COMPLAINT FOR MANDAMUS
# and DAMAGES UNDER *BIVENS*,
# 42 USC § 1983, and THE ELLIOT-LARSON ACT

August 14, 2022.

W. S. Spencer
Thompsonville, Michigan.

i

## Table of Contents

INTRODUCTION .................................................................................................................. 1

PARTIES .............................................................................................................................. 4

   Plaintiff ............................................................................................................................ 4

   Pfizer  Defendants .......................................................................................................... 4

   Federal Government Defendants ................................................................................... 5

   State Government Defendants ....................................................................................... 8

JURISDICTION AND VENUE ............................................................................................ 9

GENERAL ALLEGATIONS .............................................................................................. 12

   Unconstitutional Statutory Provisions ....................................................................... 12

   The PFIZER Defendants .............................................................................................. 16

     *Unprecedented Profit Under the EUA* ..................................................................... 16

     *Conspiracy to Conceal Constitutional Claims to Protect EUA Status* ................... 16

     *Pfizer's History of Violating Civil Rights Around the World* ................................. 20

   The Federal Defendants ............................................................................................... 26

     *Overview of the CMS Vaccine Mandate* .................................................................. 26

     *Emergency Use Authorization (EUA)* 21 USC § 360bbb-3. ................................... 31

     *Military EUAs 10 USC § 1107* ................................................................................ 36

     *Regulatory Failures* .................................................................................................. 39

     *CMS's Cited Statutory Authority* ............................................................................ 44

     *The CMS vaccine mandate Harmed Spencer* ......................................................... 49

     *Arbitrary and Capricious Action in Excess of Authority* ....................................... 51

     *Failure to Reasonably Consider Crucial Factors* .................................................... 52

     *Failure To Provide Notice And Receive Comment 42 USC § 1395hh* ................... 66

     *Failure to Prepare Regulatory Impact Analysis 42 USC § 1302* ........................... 69

     *Failure to Consult with Appropriate State Agencies 42 USC § 1395z* ................... 70

     *Unlawful Supervision and Control 42 USC § 1395* ................................................ 72

     *Violation of Informed Consent Requirement 21 C.F.R. § 50.20* ............................. 73

     *Unconstitutional Exercise of the Spending Power* .................................................. 74

     *Other Contradictions, Concessions, and Omissions* ............................................... 76

   THE STATE DEFENDANTS ........................................................................................... 80

     *Federal Preemption* .................................................................................................. 81

     *Failure to Enforce Anti-Commandeering Doctrine* ................................................ 85

CLAIMS FOR RELIEF ........................................................................................................ 90
    *Violation of Anti-Commandeering Doctrine* ......................................................... 90
    *Violation of First Amendment Rights* ................................................................... 91
    *Violation of Fourth Amendment Rights* ................................................................ 94
    *Violation of Fifth Amendment Rights* ................................................................... 96
    *Violation of Ninth Amendment Rights* .................................................................. 99
    *Violation of Tenth Amendment Rights* ................................................................ 102
    *Violation of Fourteenth Amendment* .................................................................. 111
    *Fraudulent Misrepresentation* ........................................................................... 115
    *Mandamus* ......................................................................................................... 119
    *Injuries* ............................................................................................................... 124
    *Elliot Larson Act* ................................................................................................ 126
    *Concert of Action* ............................................................................................... 131
    *Conspiracy* ......................................................................................................... 132
COUNT I: DECLARATORY JUDGMENT ....................................................................... 132
COUNT II: FRAUDULENT MISREPRESENTATION ...................................................... 134
COUNT III: DECLARATORY JUDGMENT ..................................................................... 135
COUNT IV:  DECLARATORY JUDGMENT .................................................................... 136
COUNT V: FIRST AMENDMENT ................................................................................... 138
COUNT VI. FOURTH AMENDMENT .............................................................................. 138
COUNT VII: FIFTH AMENDMENT .................................................................................. 139
COUNT VIII: NINTH AMENDMENT ................................................................................ 140
COUNT IX: TENTH AMENDMENT .................................................................................. 141
COUNT X: FOURTEENTH AMENDMENT ...................................................................... 142
COUNT XI: ELLIOT-LARSON ACT ................................................................................ 143
COUNT XII: CONCERT OF ACTION .............................................................................. 143
COUNT XIII: CONSPIRACY ........................................................................................... 144
COUNT XIV:  MANDAMUS ............................................................................................. 145
INDEX OF EXHIBITS ..................................................................................................... 147

## Cases

*Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009) .................................................................**20, 21, 22, 23**

*Abdullahi v. Pfizer, Inc.,* No. 01 Civ. 8118, 2002 U.S. Dist. LEXIS 17436 at 4-7 (S.D.N.Y. 9/17/2002),..........**24**

*Alabama Ass'n of Realtors v. Dept. of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).......................**52**

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998)........................................................**55**

*Am. Fed'n of State, County & Mun. Employees Council 79 v. Rick Scott*, 717 F.3d 851 (11th Cir. 2013) ...**101**

*Arizona v. United States*, 567 U.S. 387 (2012) ...............................................................................**84**

*Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971)..............................................................**83**

*B.C. v. Plumas Unified Sch. Dist.* (9th Cir. Sep. 20, 1999, No. 97-17287) ..............................................**95**

*Bivens v Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) .....................................................**10**

*Buck v. Bell*, 274 U.S. 200 (1927) ...............................................................................................**109**

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)...............................................**53, 54**

*Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir.1988).......................................................**117**

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)...................................**50, 93**

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) ......................................................................**81**

*Cruzan v Director, Missouri Dept of Health*, 497 U.S. 261 (1990) .....................................................**107**

*Decatur v. Paulding*, 39 U.S. (1 Pet.) 496 (1840)............................................................................**124**

*Dept. of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907, 1909 (2020).......**54**

*Development Co. v. Silva*, 125 U.S. 247 (1888) ..............................................................................**116**

*Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003)..............................................................**passim**

*Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004)...........................................................................**37**

*Dreyer v. Illinois.*, 187 U.S. 71 (1902) ........................................................................................**110**

*Elliott v. Smith & Nephew*, Case No. 12-CV-0070, 2013 U.S. Dist. LEXIS 59072 (D. Idaho 4/15/2013) ........**83**

*Engquist v. Or. Dept. of Agric.*, 553 U.S. 591 (2008)................................................................**112, 114**

*Federal Election Com. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27 (1981) ..........**26, 53, 76**

*Fulton v Philadelphia*, 141 S. Ct. 1868 (2021) ...............................................................................**81**

*Fund for Animals v. Norton,*294 F.Supp.2d 92 (D.D.C. 2003)...............................................................**54**

*Georgia v Biden*, No. 1:21-CV-163, 2021 WL 5779939, at *1 (S.D. Ga. 12/07/2021) ..................................**2**

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ..............................................................................**52**

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F. 2d 33 (2d. Cir. 1983) .............................................**90**

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) ................................................**54**

*Independent Business v. Sebelius*, 567 U.S. 519 (2012) ...................................................................**89**

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)....................................................................**passim**

*Johnson v Brown*, 3:21-cv-1494-SI (D. Or. Oct. 18, 2021).................................................................**33**

*Johnson v. Duffy,* 588 F.2d 740 (9th Cir.1978) ......................................................................**116, 117**

*Katz v. United States*, 389 U.S. 347 (1967) ...................................................................................**94**

*Kentucky v Biden*, 23 F 4th 585 (6th. Cir. 2022) ...............................................................**119, 125, 126**

*Maryland v. King*, 569 U.S. 435 (2013).........................................................................................**95**

*Meals v. City of Memphis,* 493 F.3d 720 (6th Cir.2007) ..................................................................**129**

*Medtronic v. Lohr*, 518 U.S. 470 (1996)..............................................................................**81, 82, 83**

*Michigan v. EPA*, 576 U.S. 743 (2015) ...............................................................................**53, 54, 55**

*Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982).................................................**15, 126**

*Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto, Ins. Co.,* 463 U.S. 29 (1983) ...........................**53, 76**

*Murphy v. NCAA*, 138 S.Ct. 1461  (2018).....................................................................................**89**

*Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013)............................................**82, 83, 85**

*New York v. United States*, 505 U.S. 144 (1992) ..............................................................**86, 87**

*NFIB v. Sebelius*, 567 U.S. 519 (2012)...............................................................................**74**

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020)......................**57**

*Pennhurst State School v. Halderman*, 451 U.S. 1 (1981)............................................**74, 89**

*Perry v Sinderman*, 408 U.S. 593 (1972) ...........................................................................**51**

*Perry v. Sindermann*, 408 U.S. 593 (1972) ....................................................................**14, 113**

*Prigg v. Pennsylvania*, 41 U.S. 539 (1842) ........................................................................**86**

*Printz v. United States*, 521 U.S. 898 (1997) ................................................................**74, 88**

*Rakas et al. v. Illinois* 439 U.S. 128 (1978).......................................................................**95**

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)..............**90, 98, 107, 108**

*Ross v. Moffitt*, 417 U.S. 600 (1974) .................................................................................**114**

*Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 365 (App. Div. 2nd Dept. 1977) .................**83**

*Siderman de Blake v. Republic of Arg.*, 965 F.2d 699 (9th Cir. 1992) ...............................**22**

*Smith v Department of Public Health*, 428 Mich. 540 (1987) .....................................**80, 90**

*State Farm Mutual Auto. Ins. Co.*, 463 U.S. at 29 (1983)..................................................**26**

*Transunion LLC v. Ramirez*, 141 S.Ct 2190 (2021)..........................................................**125**

*Udall v Tallman*, 380 U.S. 1 (1965)...................................................................................**53**

*Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009) ............................................................**75**

*Vernonia Sch. Distr. 47J v. Acton*, 515 U.S. 646 (1995).....................................................**95**

*Washington v. Glucksberg*, 521 U.S. 702 (1997).............................................................**112**

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ...............................................**52**

*Wilbur v. United States*, 281 U.S. 206 (1930) ..................................................................**124**

*Wood v. Carpenter*, 101 U.S. 135 (1879) .........................................................................**118**

*Work v. Rives*, 267 U.S. 175 (1925) .................................................................................**124**

*Wyeth v. Levine*, 555 U.S. 555 (2009).........................................................................**83, 84**

*Zucht v. King*, 260 U.S. 174 (1922) ................................................................................**109**

### Statutes

10 USC § 1107.........................................................................................................**36, 37, 38**

21 USC § 355.........................................................................................................................**32**

21 USC § 360bbb-3 ........................................................................................................**passim**

28 USC § 1331.......................................................................................................................**9**

28 USC § 1332.......................................................................................................................**9**

28 USC § 1343(a)(3) .............................................................................................................**9**

28 USC § 1361.....................................................................................................................**10**

28 USC § 1367.....................................................................................................................**10**

28 USC § 2201............................................................................................................**132, 135**

28 USC §1391(b)(2)...............................................................................................................**11**

42 USC § 1302(a)..................................................................................................................**44**

*42 USC § 1395* ....................................................................................................................**72**

42 USC § 1395eee(f).............................................................................................................**48**

42 USC § 1395hh(a)(1) .....................................................................................................**44, 51**

42 USC § 1395hh(b)(1) .........................................................................................................**66**

42 USC § 1395hh(b)(2)(C) ........................................................................................ 66
42 USC § 1395i–3 .............................................................................................. 49, 71
42 USC § 1395i–3(d)(4)(B) ....................................................................................... 49
42 USC § 1395i–4(e) ........................................................................................... 46, 71
42 USC § 1395k(a)(2)(F)(i) ............................................................................. 47, 48, 71
42 USC § 1395rr(b)(1)(A) ........................................................................................ 47
42 USC § 1395x(cc)(2) ........................................................................................... 71
42 USC § 1395x(e)(9) ............................................................................................ 71
42 USC § 1395x(j) ................................................................................................ 71
42 USC § 1395x(o)(6) ............................................................................................ 71
42 USC § 1395z .......................................................................................... 66, 71, 72
42 USC § 1396d(d)(1) ......................................................................................... 45, 46
42 USC § 1396d(h)(1)(B)(i) ...................................................................................... 45
42 USC § 247d-6d(a) ............................................................................................... 1
42 USC § 247d-6d(b)(1) .................................................................................... passim
42 USC § 247d-6d(b)(7) .................................................................................... passim
42 USC § 247d–6d(b)(8) .............................................................................. 13, 14, 133
42 USC § 247d–6d(c)(1)(A) ...................................................................................... 26
42 USC §1983 .................................................................................................... 10
42 USC 1395hh(b)(1) ............................................................................................. 67
5 USC § 553 ............................................................................................... 66, 67, 69
5 USC § 553(b)(B) ........................................................................................... 66, 69
5 USC § 706(2) ................................................................................................... 119
5 USC 706(2)(A) .................................................................................................. 52
Americans with Disabilities Act ................................................................................ 29
Civil Rights Act of 1964 ......................................................................................... 29
CVP 213(8) ........................................................................................................ 11
CVP 214(5) ........................................................................................................ 11
DC Code § 12–301 ................................................................................................ 11
FD&C Act § 564 ................................................................................................... 32
MCL § 37.2022(1)(a) ............................................................................................ 130
MCL § 37.2022(1)(b) ............................................................................................ 128
MCL § 37.2102(1) .......................................................................................... 111, 127
MCL § 37.2201(a) .................................................................................................. 8
MCL § 37.2202(1)(a) ............................................................................................ 127
MCL § 37.2202(1)(b) ............................................................................................ 127
MCL § 37.2203 ................................................................................................... 128
MCL § 37.2209 ................................................................................................... 129
MCL § 37.2801(1) ................................................................................................. 11
MCL § 37.2801(2) ................................................................................................. 11
MCL § 37.2801(3) .................................................................................................. 4
MCL § 37.2803 ................................................................................................... 126
MCL § 600.5855 ................................................................................................... 11
MCL § 691.1407 .................................................................................................... 2

NJ Rev Stat § 26:14-4 (2013) ............................................................................................... 101


**Other Authorities**

1 Corinthians 3:16-17.......................................................................................................... 15
1 Corinthians 6:19-20.......................................................................................................... 15
1 Corinthians 6:20............................................................................................................... 15
86 Fed. Reg. at 61,559 ...................................................................................................60, 61
86 Fed. Reg. 61,555 ................................................................................................................ 3
86 Fed. Reg. at  61,577 ........................................................................................................ 27
86 Fed. Reg. at 61,555. ....................................................................................................... 29
86 Fed. Reg. at 61,559 ...................................................................................................65, 77
86 Fed. Reg. at 61,560 ........................................................................................................ 78
86 Fed. Reg. at 61,563 ........................................................................................................ 78
86 Fed. Reg. at 61,565 ........................................................................................................ 79
86 Fed. Reg. at 61,565-66 ................................................................................................... 61
86 Fed. Reg. at 61,566 ...................................................................................................27, 62
86 Fed. Reg. at 61,567 ................................................................................................. passim
86 Fed. Reg. at 61,568 ...................................................................................................29, 65
86 Fed. Reg. at 61,569 ............................................................................................27, 61, 64
86 Fed. Reg. at 61,570 ...................................................................................................28, 29
86 Fed. Reg. at 61,571 ...................................................................................................29, 30
86 Fed. Reg. at 61,573 ........................................................................................................ 30
86 Fed. Reg. at 61,574 ...................................................................................................30, 79
86 Fed. Reg. at 61,583 ...................................................................................................67, 68
86 Fed. Reg. at 61,584 ........................................................................................................ 68
86 Fed. Reg. at 61,585 ........................................................................................................ 27
86 Fed. Reg. at 61,586 ........................................................................................................ 67
86 Fed. Reg. at 61,602 ........................................................................................................ 27
86 Fed. Reg. at 61,603 ...................................................................................................30, 64
86 Fed. Reg. at 61,604 ...................................................................................................27, 77
86 Fed. Reg. at 61,606 ........................................................................................................ 64
86 Fed. Reg. at 61,607 ............................................................................................30, 60, 63, 64
86 Fed. Reg. at 61,608 ...................................................................................................64, 78
86 Fed. Reg. at 61,609 ........................................................................................................ 78
86 Fed. Reg. at 61,610 ........................................................................................................ 28
86 Fed. Reg. at 61,612 ...................................................................................................28, 62
86 Fed. Reg. at 61,613 ........................................................................................................ 62
86 Fed. Reg. at 61,614. ..................................................................................................76, 77
86 Fed. Reg. at 61,615 ...................................................................................................67, 78
86 Fed. Reg. at 61576 ...................................................................................................28, 59, 75
Article 7 of the International Covenant of Civil and Political Rights ................................. 22
BMJ (Clinical Research Ed.). 322 (7280) ............................................................................ 24

Code of Ethics of the World Medical Association, art. III(3)(a),........................................................ 23
Executive Order 14042 ...................................................................................................................... 2
Federalist #46 .................................................................................................................................. 86
Goldacre, Ben. *Bad Pharma. Fourth Estate,* 2012 ........................................................................ 24
Leviticus 19:28................................................................................................................................. 15
Nuremberg Code, Article 1............................................................................................................. 101
*Sevan Gazit et al* ............................................................................................................................ 78
Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates
  Against COVID19 in Healthy Individuals ................................................................................... 36

## Regulations

21 C.F.R. § 50.20 ..................................................................................................................... 73, 120

## Constitutional Provisions

Const.1963, Art. I, § 4 ............................................................................................................. 53, 142
Fifth Amendment ...................................................................................................................... passim
First Amendment....................................................................................................................... passim
Fourteenth Amendment ............................................................................................................ passim
Fourth Amendment.................................................................................................................... passim
Ninth Amendment ..................................................................................................................... passim
Tenth Amendment ..................................................................................................................... passim
U.S. Constitution art. IV § 2 ...................................................................................................... passim
U.S. Constitution, art. VI, cl. 2................................................................................................... 87

## **INTRODUCTION**

1. Congress has no authority to extend immunity from constitutional claims.

2. Plaintiff objects to overreaching federal COVID-19 policy and invokes delegated and reserved U.S. Constitution guaranteed rights, privileges, and immunities to support this petition for redress of grievances against government actors who have caused Plaintiff's injuries of constitutional magnitude.

3. Plaintiff challenges the constitutional validity of 42 USC § 247d–6d(b)(7) and (8) which affirmatively deny any forum for redress of grievances against government officials that fail to execute a clear legal duty owed to Plaintiff.

4. 42 USC §§ 247d-6d(a) and 247d-6d(b)(1) provide a mechanism for the federal government defendants named herein to vest drug manufacturers and distributers with statutory immunity as follows:

> "(a) Liability protections (1) In general Subject to the other provisions of this section, a [drug manufacturer or distributor] shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."

5. 42 USC §§ 247d-6d(a) and 247d-6d(b)(1) do not, by their terms, declare immunity for unconstitutional acts committed by drug manufacturers and distributers.

1

6. *Statutory* immunity has no application to the *constitutional* claims brought against PFIZER officials who are acting under contract with the U.S. ARMY.

7. Michigan's MCL § 691.1407 does not, by its terms, declare immunity for unconstitutional acts committed by state actors.

8. Plaintiff is suing PFIZER for injuries sustained as the direct and proximate result of the fraudulent willful misconduct of PFIZER officials in furtherance of an unconstitutional scheme to preserve the Emergency Use Authorization ("EUA") immunity status of PFIZER's COVID-19 vaccines.

9. PFIZER and its officials are Federal actors for purposes of *Bivens* liability, and they are State actors for purposes of § 1983 liability.

10. PFIZER's 7/21/2020 "OPERATION WARP SPEED" contract with the U.S. ARMY PICATINNY ARSENAL establishes that PFIZER and its officials are acting under color of law at all times relevant herein. (Exhibit 1).

11. On 9/09/2021 President Biden issued Executive Order 14042, 860 Fed.Reg. 50985 to mandate "that contractors and subcontractors performing work on certain federal contracts ensure that their employees and others working in connection with the federal contracts are fully vaccinated against COVID-19."[1]

---

[1] *Georgia v Biden*, No. 1:21-CV-163, 2021 WL 5779939, at *1 (S.D. Ga. 12/07/2021). Executive Order 14042 does not itself require federal contractors and subcontractors receive vaccines. Instead, it requires federal contractors and subcontractors comply with guidance from the "Safer Federal Workforce Task Force." On 9/24/2021, the Safer Federal Workforce Task Force issued guidance requiring certain contractors and subcontractors be fully vaccinated. For a more complete history of the federal contractor vaccine mandate, *see Georgia v. Biden*, No. 1:21-CV-163, 2021 WL 5779939, at *1-4 (S.D. Ga. 12/07/2021).

12. On 11/05/2021, the Centers for Medicare and Medicaid Services ("CMS") published the CMS Vaccine Mandate[2] to promulgate President Biden's Executive Order.

13. CMS did not follow the indispensable provisions of the Administrative Procedure Act ("APA")[3] when it published the CMS Vaccine Mandate thus, the CMS Vaccine Mandate is a procedure based authoritative instrument that is based on invalid procedure.

14. President Biden's Executive Order, the Health and Human Services ("HHS") EUA, and the CMS Vaccine Mandate each denied Plaintiff's religious, medical, and bodily autonomy United States Constitution protected rights.

15. Plaintiff is entitled to a writ of mandamus to compel the Federal actor Defendants to Stay enforcement of the CMS Vaccine Mandate until after the responsible administrative agencies satisfy the relevant mandated procedure.

16. A government owned medical care facility violated Plaintiff's rights delegated under the Free Exercise Clause, the Substantive due process Clause and Michigan's Elliot-Larson Civil Rights Act by treating Plaintiff disparately from similar job applicants as a result of Plaintiff's religious beliefs.

17. The State actor Defendants acted under color of law to violate Plaintiff's religious, medical, and bodily autonomy rights in furtherance of President

---

[2] 86 Fed. Reg. 61,555
[3] 5 USC § 500, *et. seq.*

3

Biden's Executive Order, the EUA, the CMS Vaccine Mandate and the fraudulent concealment of constitutional claims by PFIZER officials.

18. Plaintiff claims damages against the State actors for injuries or losses caused by each violation of the Elliot-Larson Civil Rights Act, including reasonable attorney's fees. MCL § 37.2801(3).

## PARTIES

### Plaintiff

19. W.S. Spencer is a direct descendant of the Posterity of the People of the United States and thus a joint heir to the United States Constitution. He resides in the Northwoods of Benzie County, Michigan. He sues to vindicate his rights under the U.S. Constitution. He has no other effective means to vindicate these rights.

### Pfizer Defendants

20. Pfizer, Inc. ("PFIZER") is an American multinational pharmaceutical and biotechnology corporation headquartered at: 401 N. Middletown Road, Pearl River, NY. PFIZER is operating under contract with the U.S. ARMY. It is sued in its private and/or *quasi*-governmental capacity as the Court may deem appropriate.

21. Vanessa Gelman ("GELMAN") is Senior Director of Worldwide Research, Development & Medical Communications at PFIZER. She conducts business at

4

1275 Pennsylvania Avenue, Washington, DC.  She is sued in her private and/or *quasi*-governmental capacity as the Court may deem appropriate.

22. Philip Dormitzer ("DORMITZER") was at all times herein the Chief Scientific Officer for Viral and RNA Vaccines at PFIZER, where he led programs that included the Pfizer-BioNTech RNA-based COVID-19 vaccine collaboration. He is now the Senior Vice President and Global Head of Vaccines Research and Development at GlaxoSmithKline, and conducts business at 200 Cambridgepark Drive, Cambridge, Massachusetts.  He is sued in his private and/or *quasi*-governmental capacity as the Court may deem appropriate.

23. Adviat Badkar ("BADKAR") is a Senior Director, Novel Delivery Technologies, Biotherapeutics Pharmaceutical Sciences at PFIZER.  He conducts business at: 235 E 42nd Street, New York City.  He is sued in his private and/or *quasi*-governmental capacity as the Court may deem appropriate.

24. Where appropriate PFIZER, GELMAN, DORMITZER, and BADKAR are collectively referred to as "the PFIZER Defendants."

## **Federal Government Defendants**

25. Joseph R. Biden, Jr., is the President of the United States of America and conducts business at 1600 Pennsylvania Avenue, Washington, DC. He is responsible for the creation, promulgation, and implementation of federal administrative policy, as well as the training and education of federal executive

5

subdivision chiefs and subordinates.  He is sued in his private and/or official capacity as the Court may deem appropriate.

26. HHS is an independent federal agency and conducts business at 200 Independence Avenue, Washington, DC.  It is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of HHS chiefs and subordinates.  It is sued in its private and/or official capacity as the Court may deem appropriate.

27. Defendant Xavier Becerra ("BECERRA") is the Secretary of HHS. BECERRA did approve and/or allowed continued approval of the Emergency Use Authorization ("EUA") for the subject mandated vaccines, setting into motion the current deprivation of federal constitutional rights demonstrated herein. He conducts business at 200 Independence Avenue, Washington, DC.  He is sued in his private and/or official capacity as the Court may deem appropriate.

28. Defendant CMS is part of HHS and conducts business at 7500 Security Boulevard, Baltimore, Maryland.  It is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of CMS chiefs and subordinates.  It is sued in its private and/or official capacity as the Court may deem appropriate.

29. Defendant Chiquita Brooks-LaSure ("BROOKS-LASURE") is the Administrator for the Centers for Medicare and Medicaid Services ("CMS"),

6

where she oversees programs including Medicare, Medicaid, the Children's Health Insurance Program ("CHIP"), and the HealthCare.gov health insurance marketplace.  She conducts business at 7500 Security Boulevard, Baltimore, Maryland.  She is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of CMS and CHIP chiefs and subordinates.  She is sued in her private and/or official capacity as the Court may deem appropriate.

30. Defendant Meena Seshamani ("SESHAMANI") is a Deputy Administrator and Director for CMS and conducts business at 7500 Security Boulevard, Baltimore, Maryland.  She is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of CMS chiefs and subordinates.  She is sued in her private and/or official capacity as the Court may deem appropriate.

31. Defendant Daniel Tsai ("TSAI") is a Deputy Administrator and Director for CMS and CHIP Services. He is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of CMS chiefs and subordinates.  TSAI conducts business at 7500 Security Boulevard, Baltimore, Maryland.  He is sued in his private and/or official capacity as the Court may deem appropriate.

32. The FDA is an agency within HHS.  It conducts business at 10903 New Hampshire Ave, Silver Spring, Maryland.  It is sued in its private and/or official capacity as the Court may deem appropriate.

33. Defendant Janet Woodcock ("WOODCOCK") is the acting FDA Commissioner.  She is responsible for the promulgation and implementation of federal administrative policy, as well as the training and education of FDA chiefs and subordinates.  WOODCOCK conducts business at 10903 New Hampshire Ave, Silver Spring, Maryland.  She is sued in her private and/or official capacity as the Court may deem appropriate.

34. Where appropriate BIDEN, HHS, BECERRA, CMS, BROOKS-LASURE, SESHAMANI, TSAI, FDA, and WOODCOCK are collectively referred to as "the Federal Defendants."

## State Government Defendants

35. Defendant BENZIE COUNTY CORPORATION is a body corporate chartered by the State of Michigan. It conducts business at: 448 Court Place Beulah, Michigan.  It is sued in its private and/or official capacity as the Court may deem appropriate.

36. Defendant "THE MAPLES" is a county-owned Medicare and Medicaid skilled nursing facility in Frankfort, Michigan.  It conducts business pursuant to MCL § 37.2103(g) and MCL § 37.2201(a) at: 210 Maple Avenue, Frankfort, in

Benzie County Michigan. It is sued in its private and/or official capacity as the Court may deem appropriate.

37. Defendant Megan Garza ("GARZA") is Operations Director/HR for The Maples and conducts business pursuant to MCL § 37.2103(g) at: 210 Maple Avenue, Frankfort, in Benzie County Michigan. She is an official policy maker for the Maples responsible for the promulgation and implementation of federal and county policy, as well as the training and education of THE MAPLES subdivision chiefs and subordinates. She is sued in her private and official capacities as the Court may deem appropriate.

38. Where appropriate BENZIE COUNTY CORPORATION, THE MAPLES, and GARZA are collectively referred to as "the State Defendants."

## JURISDICTION AND VENUE

39. This Court has 28 USC § 1331 jurisdiction over this civil action arising under the Constitution, laws, or treaties of the United States.

40. This Court has 28 USC § 1332 jurisdiction over this action where the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and involves citizens of different States.

41. This Court has 28 USC § 1343(a)(3) jurisdiction to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity delegated or reserved by the Constitution of the

United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

42. This Court has 28 USC § 1361 jurisdiction over this hybrid mandamus action to compel an officer or employee of the United States or any agency thereof to perform a clear constitutional duty owed to Spencer.

43. This Court has 42 USC §1983 jurisdiction over claims against State actors alleged to have engaged in the deprivation of rights, privileges, or immunities delegated or reserved by the United States Constitution.

44. This Court has *Bivens*[4] jurisdiction over claims to recover money damages for injuries caused by individual *quasi-governmental* actors alleged to have engaged in the deprivation of rights, privileges, or immunities delegated or reserved by the United States Constitution while under operating under contract with the U.S. ARMY.

45. This Court has 28 USC § 1367 jurisdiction over state law claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

---

[4] *Bivens v Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) at 397.

46. This Court has MCL § 37.2801(1) jurisdiction over claims to injunctive relief or damages, or both, alleging violations of Michigan's Elliot-Larson Civil Rights Act.

47. This Court has personal jurisdiction over the Federal Defendants.

48. This Court has personal diversity jurisdiction of the PFIZER Defendants who reside or conduct business outside of Michigan.

49. This Court has personal jurisdiction over Spencer and the State Defendants who each reside or conduct business within the territorial jurisdiction of this Court.

50. Limitations do not apply to this hybrid action commenced within 2 years after the existence of the claim or the identity of the persons liable for the claims was discovered.[5]

51. Limitations do not apply to this hybrid action for mandamus and damages based on fraud commenced within 6 years from the date the cause of action accrued.[6]

52. Limitations do not apply to this hybrid action for mandamus and to recover damages for personal injuries commenced within 3 years.[7]

53. Venue is proper under 28 USC §1391(b)(2) where a substantial part of the events or omissions giving rise to the claims occurred within the territorial jurisdiction of this Court and MCL § 37.2801(2) where the alleged injuries occurred within Michigan.

---

[5] MCL § 600.5855.

[6] CVP 213(8).

[7] CVP 214(5); DC Code § 12–301.

11

54. The infringement of federal rights alleged herein is fairly attributable to each Defendant jointly and severally.

## GENERAL ALLEGATIONS

### Unconstitutional Statutory Provisions

55. 42 USC § 247d–6d(b)(7) provides: "No court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection."

56. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it denies any forum to redress grievances submitted to the Court under the Free Exercise Clause of the First Amendment to the United States Constitution.

57. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it denies substantive liberty and property interests guaranteed under of the Fourth Amendment to the United States Constitution.

58. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it violates the Substantive Due Process Clause of the Fifth Amendment to the United States Constitution.

59. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it usurps the police power of the States reserved under the Tenth Amendment to the United States Constitution.

60. Spencer has sustained or is in immediate danger or sustaining some direct injury as a result of the enforcement of 42 USC § 247d–6d(b)(7); he does not merely suffer in some indefinite way in common with the people generally.

61. 42 USC § 247d–6d(b)(8) provides: "Preemption of State law During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act [21 U.S.C. 301 *et seq*.]."

62. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it denies any forum to redress grievances against the government under the Free Exercise Clause of the First Amendment to the United States Constitution.

13

63. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it denies substantive liberty and property interests guaranteed under of the Fourth Amendment to the United States Constitution.

64. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it violates the Substantive Due Process Clause of the Fifth Amendment to the United States Constitution.

65. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it usurps the police power of the States reserved under the Tenth Amendment to the United States Constitution.

66. Spencer has sustained or is in immediate danger or sustaining some direct injury as a result of the enforcement of 42 USC § 247d–6d(b)(8); he does not merely suffer in some indefinite way in common with the people generally.

67. Spencer enjoys a substantive property interest in the benefit of exemption from the CMS Vaccine Mandate for substantive due process purposes because there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit which he may invoke at a hearing.[8]

68. Spencer has suffered serious economic and noneconomic injuries where the State Defendants discriminated against him by perpetuating archaic and

---

[8] *Perry v. Sindermann,* 408 U.S. 593 (1972) at 601.

stereotypic notions or by stigmatizing him as innately inferior and therefore as a less-worthy participant in the community.[9]

69. Spencer does not consent to the CMS Vaccine Mandate and finds it reprehensible that PFIZER uses aborted babies to create its vaccines.

70. Spencer was discriminated against and denied equal opportunity employment by the Defendants (Exhibit 2) based on his faith in his redemption from the curse of Adam by the blood of Yahshua of Nazareth which pervades his life each and every day where, by the authority of the Word of Yahweh, he sets his body apart from the masses as a sacred temple for the Word of Yahweh.[10]

71. Spencer was qualified for several positions when his equal opportunity for employment was denied.

72. Spencer suffered the loss of: (a) equal opportunity employment and the taxable income associated therewith; (b) 401K/MERSE; (c) life insurance; (d) short- and long-term disability insurance; (e) health insurance; (f) dental insurance; (g) AFLAC insurance; (h) vacation time; and (i) membership in the healthcare workers union.

73. Spencer further relies on and incorporates herein his Affidavit (Exhibit 2).

---

[9] *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982) at 725.
[10] 1 Corinthians 3:16-17 ("Know ye not that ye are the temple of Yahweh, and that the Spirit of Yahweh dwelleth in you?"); 1 Corinthians 6:19-20 ("What? know ye not that your body is the temple of the Holy Ghost, which is in you, which ye have of Yahweh, and ye are not your own?"); Leviticus 19:28 ("Ye shall not make any cuttings in your flesh for the dead, nor print any marks upon you: I am Yahweh."); 1 Corinthians 6:20 – ("For ye are bought with a price: therefore glorify Yahweh in your body, and in your spirit, which are Yahweh's.").

74. Spencer's injuries would likely be redressed by judicial relief.

## The PFIZER Defendants

75. As federal contractors participating in OPERATION WARP SPEED, the PFIZER Defendants are performing a *quasi*-governmental function and must perform their duties consistent with the Federal Constitution. (Exhibit 1).

76. The joint and several actions taken by the PFIZER officials amounted to gross negligence or deliberate indifference to the injuries suffered by Spencer.

### *Unprecedented Profit Under the EUA*

77. PFIZER reports that the vaccine business alone is responsible for more than 60% of the company's worldwide sales, as vaccine revenue rose to $14.6 billion from only $1.7 billion last year.

### *Conspiracy to Conceal Constitutional Claims to Protect EUA Status*

78. The PFIZER Defendants were at all times acting beyond the scope of the authority granted to them by their federal contract with the U.S. ARMY PICATINNY ARSENAL (Exhibit 1) when they organized to conceal that aborted babies are used in the manufacture of PFIZER's vaccines.

79. In a 10/06/2021 interview, Melissa Strickler, a Quality Officer at PFIZER, blew the whistle on PFIZER.  According to Strickler, she searched the company's email server and discovered that the PFIZER Defendants were organizing to

protect the EUA status of its COVID vaccines by concealing from the public that aborted babies were used in the creation of the PFIZER vaccine.[11]

80. Strickler provided evidence that on 2/05/2021 BADKAR sent an email to GELMAN stating that he responded to an outside inquiry about the use of fetal tissue by saying "no cell lines from an aborted fetus were used in the manufacturing process[.]" (Exhibit 3).

81. GELMAN responded saying that "we have tried really hard not to share unless it's strictly necessary and mission critical … that one or more cell lines with an origin that can be traced back to human fetal tissue has been used in laboratory tests associated with the vaccine program." (Exhibit 3).

82. DORMITZER admitted in another email that aborted babies were used to create PFIZER's vaccine: "HEK293T cells, used for the [research and development phase], are ultimately derived from fetal tissue." But he told his subordinate science officers to stick with PFIZER's talking points that obscure the truth. (Exhibit 3).

83. On 2/09/2021 GELMAN sent an email to top brass at PFIZER stating: "From the perspective of corporate affairs, we want to avoid having the information on fetal tissue floating out there." (Exhibit 3).

---

[11] https://www.projectveritas.com/video/pfizer-leaks-whistleblower-goes-on-record-reveals-internal-emails-from-chief-scientific/. Last visited: 7/25/2022.

84. In an email dated 2/04/2021, GELMAN was asked by BADKAR: "This question came in as an enquiry to our Med Info group… 'Did PFIZER make use of a cell line from an aborted fetus when carrying out any confirmatory tests for this vaccine?'" BADKAR added, "This is AFTER we had already confirmed with the customer that no cell lines from an aborted fetus were used in the manufacturing process of the COVID-19 mRNA Vaccine BNT162b2." (Exhibit 3).

85. GELMAN responded, "We have been trying as much as possible not to mention the fetal cell lines," providing an additional paragraph that was half in red, and half in yellow. The piece in yellow, GELMAN said, "We have tried really hard not to share unless it's strictly necessary and mission critical." (Exhibit 3).

86. The red portion was consistent with BADKAR's original email, "Human fetal derived cell lines are not used to produce our investigational vaccine, which consists of synthetic and enzymatically produced components." (Exhibit 3).

87. But the yellow portion contained the admission, "One or more cell lines with an origin that can be traced back to aborted fetal tissue has been used in laboratory tests associated with the vaccine program." (Exhibit 3).

88. Later in the email chain DORMITZER confirmed, "HEK293T [Human Embryonic Kidney] cells, used for the IVE assay, are ultimately derived from an aborted fetus. *On the other hand, the Vatican doctrinal committee has*

18

*confirmed that they consider it acceptable for Pro-Life believers to be immunized.*" DORMITZER added, "PFIZER's official statement couches the answer well and is what should be provided in response to an outside inquiry." (Exhibit 3).

89. On 2/05/2021 GELMAN followed up in the email chain, wanting to confirm with BADKAR and several other staffers where the request originated in order to insure it was not from a "member of the public," because GELMAN "just want[ed] to make sure we aren't responding to a legitimate request that may ignite a FB campaign on this that we may ultimately need to manage." (Exhibit 3).

90. On 2/09/2021, GELMAN reiterated to the now-dozen PFIZER employees who have been brought into the email chain that the information on aborted babies used in the creation of the vaccine was extremely sensitive to PFIZER's profit margin, "From the perspective of corporate affairs, we want to avoid having the information on the aborted fetal tissue floating out there." "In this heated environment of heightened scrutiny on every detail on our vaccine, we would like to avoid the opportunity of creating an issue – we believe that the risk of communicating this right now outweighs any potential benefit we could see, particularly with members of the [proletariat] who may take this information and use it in ways we may not want it out there." "We have not received any

questions from policy makers or media on this issue in the last few weeks, so we want to avoid raising this, if possible." (Exhibit 3).

## *Pfizer's History of Violating Civil Rights Around the World*

91. This is not the first time that PFIZER has been caught violating the civil rights of others. *Abdullahi v. Pfizer*[12] should have convinced PFIZER not to commit civil rights violations in order to "turn a profit." In that case numerous Nigerian plaintiffs sued PFIZER after a clinical trial there allegedly "caused the deaths of eleven children…and left many others blind, deaf, paralyzed, or brain-damaged" after "approximately two weeks" of the trial.[13]

92. Also alleged, *inter alia*, was that PFIZER "failed to secure the informed consent of either the children or their guardians[,]" and "failed to disclose or explain the experimental nature of the study[,]" the "test protocol" of which had been "hastily assembled."[14] The district court dismissed on jurisdictional grounds under the Alien Tort Statute. Reversing that jurisdictional decision, the Third Circuit subsidiarily determined "the norm prohibiting non-consensual medical experimentation on human subjects has become firmly embedded and has delegated universal acceptance in the community of nations."[15]

---

[12] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[13] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[14] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[15] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

93. To reach that determination, the Third Circuit traced "the evolution of the prohibition into a norm of customary international law [beginning] with the war crimes trials at Nuremburg."[16]

94. While at first reading it may seem hyperbolic for the Third Circuit to have started with Nuremberg, it was not, because when "Congress mandated patient-subject consent in drug research in 1962[,]" "[t]ellingly, the sources on which our government relied in outlawing non-consensual human medical experimentation were the Nuremburg Code and the Declaration of Helsinki."[17]

95. The Court found that our statutes in the United States for protecting a person's right to refuse experimental investigational medical products, including vaccines, are sourced from the Nuremburg Code:

> After convicting "lower-level war criminals," "including leading physicians" of "non-consensual experiments" "testing…drugs for immunization[,]" inter alia, Military Tribunal 1 "promulgated the Nuremburg Code as part of…final judgment against fifteen doctors…." *At* ___, ___ (internal brackets and quotation marks omitted). The Code's "first principle [is] that the voluntary consent of the human subject is absolutely essential." *At* ___ (internal brackets and quotation marks omitted), citing *Brandt, 2 Nuremburg Trials,* at 181. It is important to recognize there were at least two categories of victims of Nazi medical experiments: First, "subjects…who did not consent to the experiments[,]" meaning they were "unknowing human subjects[,]" they did not know "the nature of the study[,]" being performed on them, similar to what Nigerian plaintiffs claimed. *At* ___. Second, involuntary subjects. *At* ___. Regarding those in the former category, their consent was not informed if they were un-

---

[16] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).
[17] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009)., citing 21 USC § 355(i).

informed or mis-informed (lied to) about the nature of the experiment.[18]

96. Regarding medical experiments, including those with experimental investigational vaccines, and the principle of voluntary consent, "United States courts examining the Nuremburg judgments have recognized that the universal and fundamental rights of human beings identified by Nuremberg…are the direct ancestors of the universal and fundamental norms recognized as *jus cogens*, from which no derogation is permitted, irrespective of the consent or practice of a given State."[19]

97. The Third Circuit cited two additional international law sources supporting its determination that the norm prohibiting non-consensual medical experimentation on human subjects has become firmly embedded and has delegated universal acceptance in the community of nations.

98. First, Article 7 of the International Covenant on Civil and Political Rights ("ICCPR") ("no one shall be subjected without his free consent to medical or scientific experimentation") *(not ratified in full by the United States)*. "By its terms, this prohibition is not limited to state actors; rather, it guarantees individuals the right to be free from nonconsensual medical experimentation by

---

[18] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[19] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009), citing *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699 (9th Cir. 1992) at 715.

any entity – state actors, private actors, or state and private actors behaving in concert."[20]

99. Second, the Declaration of Helsinki: Code of Ethics of the World Medical Association, art. III(3)(a), G.A. Res. (1964) *(as amended) (nonbinding)* ("In any research on human beings, each potential subject must be adequately informed of the aims, methods, … anticipated benefits and potential risks of the study…and that researchers obtain the subject's freely given informed consent, preferably in writing.") *(internal quotation marks omitted)*.[21]

100. Finally, regarding the norm prohibiting non-consensual medical experimentation in the United States, the exercise of right to refuse to participate cannot lawfully result in being denied equal opportunity employment, Defendants cannot lawfully punish job applicants for the exercise of a right to refuse.

101. The *Abdullahi* case involved the Kano trovafloxacin trial litigation which arose out of a clinical trial conducted by PFIZER in 1996 in Kano, Nigeria, during an epidemic of meningococcal meningitis. To test its new antibiotic, trovafloxacin (Trovan), PFIZER gave 100 children trovafloxacin, while another 100 received the gold-standard anti meningitis treatment, ceftriaxone, a

---

[20] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009), at 180.
[21] *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

cephalosporin antibiotic.[22]  PFIZER was accused of testing a new drug without ethical approval.[23]

102.    PFIZER gave the children a substantially reduced dose of the ceftriaxone *(specifically, 33mg/kg)*[24] relative to that described on the FDA-approved prescribing information. The allegation is that this was done to skew the test in favor of its own drug.[25]

103.    The lead investigator, Abdulhamid Isa Dutse, later provided a letter of approval for human trials that was found to be falsified.[26]

104.    In January 2009, the United States Court of Appeals for the Second Circuit ruled that the Nigerian victims and their families were entitled to bring suit against PFIZER in the United States under the Alien Tort Statute.

105.    PFIZER subsequently settled the case out of court with a $75 million settlement that was subject to a confidentiality clause.[27]

106.    In the present case, PFIZER actively violated the First Amendment delegated Free Exercise Clause right of Spencer by actively concealing that

---

[22] Wise, J. (2001).

[23] BMJ (Clinical Research Ed.). 322 (7280): 194. doi:10.1136/bmj.322.7280.194. PMC 1119465. PMID 11159610

[24] *Renne, Elisha* P. (2010). The politics of polio in northern Nigeria. Bloomington: Indiana University Press.

[25] *See Abdullahi v. Pfizer, Inc.,* No. 01 Civ. 8118, 2002 U.S. Dist. LEXIS 17436 at 4-7 (S.D.N.Y. 9/17/2002), *vacated and remanded by Ho.* 02-9223, 2003 U.S. App. LEXIS 20704 (2d Cir. 10/08/2003), *dismissed* by No. 01 Civ. 8118, 2005 U.S. Dist. LEXIS 16126 (S.D.N.Y. 8/09/2005).

[26] Wise, J. (2001). "PFIZER INC. accused of testing new drug without ethical approval". BMJ (Clinical Research Ed.). 322 (7280): 194. doi:10.1136/bmj.322.7280.194. PMC 1119465. PMID 11159610.

[27] Goldacre, Ben. *Bad Pharma. Fourth Estate*, 2012, pp. 117- 118.

Human Embryotic Kidney 293 was used in the creation of the COVID-19 vaccines.

107.    The PFIZER Defendants conspired or acted in concert with the mainstream media which is substantially sponsored by PFIZER to disseminate misinformation for the purpose of preserving the EUA status of PFIZER's COVID vaccines.[28]

108.    The fraudulent misrepresentations by the PFIZER Defendants were made in furtherance of an unconstitutional scheme to profit from the *invalid-procedure-based* EUA designation of PFIZER's vaccines.

109.    The PFIZER Defendants each feared that if the public knew that PFIZER uses aborted babies in the creation of its COVID-19 vaccines the EUA designation of PFIZER's COVID-19 vaccines would be in jeopardy.

110.    The PFIZER Defendants knew, or should have known, that operation of the CMS Vaccine Mandate would compel the State Defendants to inflict monetary injury on religious objectors such as Spencer.

111.    The fraudulent misrepresentations by the PFIZER Defendants were the moving force behind a series of events that ultimately led to a foreseeable denial of equal opportunity employment based on the deeply held religious beliefs held by Spencer.

---

[28] *Jimmy Dore:* CAUGHT! Lying Doctor STILL Misinforming About Ivermectin!
https://www.youtube.com/watch?v=qJ06IM5AYGk&list=UU3M7l8ved_rYQ45AVzS0RGA&index=4. Last visited 8/07/2022.

## **The Federal Defendants**

112. The Federal Defendants, jointly and severally, engaged in acts or omissions taken— (i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit.[29]

113. The CMS Vaccine Mandate is inconsistent with statutory mandate, frustrates congressional policy or is not supported by "substantial evidence on the record considered as a whole."[30]

114. Spencer seeks a writ of mandamus which directs the Federal Defendants, jointly and severally, to faithfully execute their clear legal duties described below, which they owe to Spencer by virtue of his rights, privileges, and immunities delegated and reserved in the United States Constitution, which control the CMS Vaccine Mandate.

### ***Overview of the CMS Vaccine Mandate***

115. The CMS vaccine mandate is a procedure based authoritative instrument.

116. On 11/05/2021, nearly two months after President Biden's Executive Order issued, CMS finally published the CMS Vaccine Mandate.

---

[29] 42 USC § 247d–6d(c)(1)(A).

[30] *Federal Election Com. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27 (1981) at 29-33; *See also State Farm Mutual Auto. Ins. Co.,* 463 U.S. at 29 (1983) at 44.

26

117.    The CMS vaccine mandate covers fifteen categories of Medicare- and Medicaid-certified providers and suppliers. By expanding its reach in this way, the mandate broadly sweeps in a diverse set of healthcare providers. These include, *inter alia,* rural health clinics, hospitals, long-term-care facilities, and home health agencies.[31]

118.    Demonstrating the far reach of the mandate, CMS reported that "Medicare-participating hospitals . . . include nearly all hospitals in the U.S."[32]

119.    CMS recognized that the "providers and suppliers regulated under this rule are diverse in nature, management structure, and size."[33]

120.    Despite this, CMS relied predominantly on data involving long-term-care facilities—*providers who serve mostly elderly and often immunocompromised patients*—to make its case for applying the vaccine mandate to fourteen other categories of Medicare- and Medicaid-certified providers.[34]

121.    CMS did this while acknowledging that "[a]ge remains a strong risk factor for severe COVID–19 outcomes,"[35] and that "risk of death from infection from

---

[31] 86 Fed. Reg. at 61,569.

[32] 86 Fed. Reg. at 61,577.

[33] 86 Fed. Reg. at 61,602.

[34] See, *e.g.,* 86 Fed. Reg. at 61,585 (discussing "case rates among [long-term-care] facility residents," and claiming, without citation, that those facilities' "experience may generally be extrapolated to other settings"), at 86 Fed. Reg. at 61,604 ("[W]e often use [long-term-care] facilities for examples because they pose some of the greatest risks for COVID–19 morbidity and mortality").

[35] 86 Fed. Reg. at 61,566.

an unvaccinated 75- to 84-year-old person is 320 times more likely than the risk for an 18- to 29-years old person."[36]

122.    CMS acknowledged that psychiatric residential treatment facilities serve privates under 21 years of age,[37] and that "rural and other community-care oriented health centers serve the full age spectrum and a lower fraction of severely health-impaired,"[38]

123.    Even though the privates served by these facilities are generally at a minimal risk from COVID-19, the CMS vaccine mandate imposed the same stringent control on psychiatric residential treatment facilities and rural health centers as it did on long-term-care facilities.

124.    CMS applied its vaccine mandate to practically every full-time employee, part-time worker, trainee, student, volunteer, or contractor working at the covered facilities.

125.    The mandate requires vaccination for all "facility staff"—a term that includes employees, trainees, students, volunteers, or contractors— "who provide any care, treatment, or other services for the facility," "regardless of . . . patient contact."[39]

---

[36] 86 Fed. Reg. at 61,610 n.247.

[37] 86 Fed. Reg. at 61576

[38] 86 Fed. Reg. at 61,612.

[39] 86 Fed. Reg. at 61,570.

28

126.   This includes "administrative staff" and "housekeeping and food services," to name a few. *Id.* CMS also imposed its mandate on "any private that . . . has the potential to have contact with anyone at the site of care."[40]  This includes "staff that primarily provide services remotely via telework" but "occasionally encounter fellow staff . . . who will themselves enter a health care facility."[41]

127.   Illustrating its breadth, the mandate also covers a contracted "crew working on a construction project whose members use shared facilities *(restrooms, cafeteria, break rooms)* during their breaks[.]"[42]

128.   Maximizing the scope of the mandate, CMS allowed exemptions only to the extent necessary to "comply with applicable Federal anti-discrimination laws and civil rights protections" such as medical exemptions required by the Americans with Disabilities Act and religious exemptions required by Title VII of the Civil Rights Act of 1964.[43]

129.   The CMS vaccine mandate became immediately effective on 11/05/2021—the day it was published.[44]

130.   Covered providers were required to implement the CMS Vaccine Mandate in two 30-day phases.[45]

---

[40] 86 Fed. Reg. at 61,571
[41] 86 Fed. Reg. at 61,570.
[42] 86 Fed. Reg. at 61,571.
[43] 86 Fed. Reg. at 61,568.
[44] 86 Fed. Reg. at 61,555.
[45] 86 Fed. Reg. at 61,571.

131.  Phase 1 requires that staff receive the first dose of the vaccine or request a medical or religious exemption by 12/05/2021.[46]

132.  And Phase 2 mandates that non-exempt staff be fully vaccinated by 1/04/2022.[47]

133.  CMS recognized the breadth of, and expedited schedule imposed by its vaccine mandate, acknowledging its "near-universal applicability" to health-care staff, and observing that under the rule "virtually all health care staff in the U.S. will be vaccinated for COVID–19 within a matter of months."[48]

134.  CMS estimated that approximately 10.3 million employees will fall under the mandate.[49]

135.  CMS settled on the draconian course of mandating vaccines because it determined that the "most important inducement [for assimilation] will be the fear of job loss."[50]

136.  CMS "expect[ed]" its vaccine mandate "to remain relevant for some time beyond the end" of the formal public health emergency and anticipates retaining the mandate "as a permanent requirement for facilities."[51]

---

[46] 86 Fed. Reg. at 61,571.
[47] 86 Fed. Reg. at 61,571.
[48] 86 Fed. Reg. at 61,573.
[49] 86 Fed. Reg. at 61,603.
[50] 86 Fed. Reg. at 61,607.
[51] 86 Fed. Reg. at 61,574.

### *Emergency Use Authorization (EUA) 21 USC § 360bbb-3.*

137. During public health emergencies, the FDA regulates medical countermeasures like emergency vaccines for newly emergent infectious diseases, such as COVID-19.

138. Congress enacted 21 USC § 360bbb-3: Authorization for Medical Products for Use in Emergencies,[52] to vest the Secretary of HHS with permissive authority to "authorize the introduction into interstate commerce, during the effective period of a declaration [of emergency], of a drug, device, or biological product intended for use in an actual or potential emergency...."[53]

139. 21 USC § 360bbb-3 mandates prospective recipients of unapproved products offered for emergency use be informed of their option to accept or refuse administration:

> With respect to the emergency use of an unapproved product, the Secretary...shall, for a person who carries out any activity for which the authorization is issued, establish such conditions...to protect the public health, including the following: ... (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed— ...(III) of the option to accept or refuse administration of the product.[54]

140. 21 USC § 360bbb-3 authorizes the FDA to issue an EUA for a vaccine under certain emergency circumstances, allowing a vaccine to be introduced and

---

[52] 21 USC § 360bbb-3
[53] 21 USC § 360bbb-3 (a)(1).
[54] 21 USC § 360bbb-3 (e)(1)(A)(ii)(II) and (III).

administered to the public even when the product has not gone through the review process necessary for approval and licensure.

141.    21 USC § 360bbb-3-(3) requires that the EUA designation be used only when "there is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating such disease or condition."

142.    21 USC § 360bbb-3(a)(2) provides for the FDA to authorize both unapproved products and uses.

143.    Where, as here, the disease threat is novel, the FDA merely authorizes, rather than approves, such products.[55]

144.    The FDA has not approved the COVID-19 vaccines; it has only granted them EUA status. These vaccines remain experimental with no assurance of efficacy.

145.    21 USC § 355 (i)(4) provides:

> Regulations under paragraph (1) shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible . . . ."

---

[55] FD&C Act § 564.

146.   On 1/31/2020, Alex M. Azar, II, the former HHS Secretary, declared a public health emergency as of 1/27/2020, pursuant to § 319 of the Public Health Service Act, 42 USC § 247d *et. seq.*

147.   On 12/11/2020, the FDA issued an EUA for use of PFIZER BioNTech COVID-19 Vaccine to prevent COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the Act.

148.   The announcement noted that the FDA had expanded the EUA of the PFIZER-BioNTech COVID-19 vaccine to include individuals 12 years of age and older.

149.   On 8/23/2021 the FDA granted a license to PFIZER's "Comirnaty" vaccine and extended the EUA for its PFIZER-BioNTech vaccine.

150.   In its letters to PFIZER and BioNTech, the FDA acknowledged that PFIZER's vaccines are "interchangeable" yet "legally distinct."[56] (Exhibit 4).

151.   It further stated: "The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably... The products are legally distinct with certain differences that do not impact safety or effectiveness."[57]  (Exhibit 4).

---

[56] See, *Johnson v Brown,* 3:21-cv-1494-SI (D. Or. Oct. 18, 2021) at 7.
[57] See, *Johnson v Brown,* 3:21-cv-1494-SI (D. Or. Oct. 18, 2021) at 7.

152.   When there are no FDA approved or cleared tests treatment or cure available, and other criteria are met, the FDA can make vaccines available under an EUA.

153.   The subject EUA is supported by the HHS's declaration that circumstances exist to justify the emergency use of experimental vaccines to combat the virus that causes COVID-19. Thus, the FDA acknowledges that these vaccines are stopgap measures authorized under emergency circumstances, without the benefit of a rigorous approval or licensing process.

154.   Both Ivermectin and Hydroxychloroquine are alternative and proven effective as prophylactic and therapeutic treatments for COVID-19.

155.   Both Ivermectin and Hydroxychloroquine have proven to be a safe and effective treatment for COVID-19 in the Republic of India.

156.   The Chairman of the State of Japan's Medical Association has authorized the use of Ivermectin for the treatment of COVID-19 patients.

157.   The continent of Africa has had tremendous success with the routine use of Hydroxychloroquine in the prevention of COVID 19 to its people.

158.   The National Institute of Health (NIH), a part of HHS, lists Ivermectin as one of three drugs in the treatment of SARS-COV-2.

159.   At the time of filing of this Complaint COVID-19 vaccines are not licensed by the FDA.

160. The FDA has not declared COVID-19 vaccines to be "safe and effective" as
they are merely "authorized" by the FDA as a medical counter measure under
EUAs.[58]

161. No FDA approval changes the fact that COVID-19 vaccines are
experimental, and investigational, and in the clinical trial stage through 2022
and beyond.

162. The rules related to the FDA's sped-up procedure for authorizing medical
products during a public health emergency leaves such products as
"unapproved."

163. The critical distinction between an EUA and FDA approval is that EUAs
must allow for an individual to refuse the experimental medical treatment under
a guaranteed 'opt-out' provision.[59]

164. But even if the FDA prematurely approves these experimental vaccines, the
CMS vaccine mandate fails due to the five-part test announced in *Jacobson v.
Massachusetts*, 197 U.S. 11 (1905). The *Jacobson* test considers (a) necessity,
(b) proportionality, (c) reasonableness, (d) harm avoidance and (e) non-
discrimination.

165. *Jacobson* pre-dates modern constitutional jurisprudence and additionally, the
defendant in *Jacobson*, never even sought a religious exemption. Thus, the

---

[58] 21 USC § 360bbb-3.
[59] 21 USC § 360bbb-3.

holding in *Jacobson* was NOT analyzed in the constitutional context of a party's request and denial for a religious exemption pursuant to a right delegated to the People and their Posterity by the United States Constitution.

166.   The FDA issued EUAs to PFIZER even though its Phase III clinical trials even now remain incomplete. PFIZER's clinical trial Estimated Primary Completion Date is 11/02/2022, and the Estimated Study Completion Date is 5/02/2023.[60]

167.   PFIZER announced on 7/16/2021, that the FDA granted Priority Review designation for the Biologics License Application (BLA) for its mRNA vaccine to prevent COVID-19 in individuals 16 years of age and older.

### *Military EUAs 10 USC § 1107*

168.   10 USC § 1107 provides:

10 USC § 1107 (f) Limitation and waiver (1) In the case of the administration of an investigational new drug or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation, the requirement that the member provide prior consent to receive the drug in accordance with the prior consent requirement imposed under section 505(i)(4) of the Federal Food, Drug, and Cosmetic Act (21 USC 355(i)(4)) may be waived only by the President. The President may grant such a waiver only if the President determines, in writing, that obtaining consent is not in the interests of national security.

---

[60] See Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID19 in Healthy Individuals, CLINICALTRIALS.GOV.

169.    Although this law applies to military personnel, it is the only case where a court ruled on an experimental vaccine mandate.

170.    Until the time of FDA approval, a vaccine with an EUA could not be forced upon soldiers.[61]

171.    *Rumsfeld #1* stands for the proposition that where a controlling statute prohibits administration of experimental investigational new drugs, or drugs unapproved for their intended use, without the informed consent of the person to whom the drug is to be administered, any program or mandate inconsistent with the controlling statute is illegal.

172.    *Rumsfeld #1* granted a preliminary injunction against the Dept. of Defense ("DoD") after it instructed military service personnel and civilian contractors to submit to anthrax vaccinations with "an investigational drug and a drug being used for an unapproved purpose" without their informed consent.[62]

173.    Later upholding its injunction, the Court stated "[u]nless and until the FDA properly classifies [the anthrax] vaccine as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants' use of [it] on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 USC § 1107.

---

[61] *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) at 135.
[62] *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003) at 135.

Accordingly, the involuntary anthrax program...is rendered illegal absent informed consent or a Presidential waiver.'"[63]

174. *Rumsfeld #1* was decided on statutory grounds, 10 USC § 1107, which "prohibits the administration of investigational new drugs, or drugs unapproved for their intended use, to service members without their informed consent[,]" absent a Presidential waiver.[64]

175. There, like here, "the central question [was] whether [the anthrax vaccine] [was] being used as an investigational new drug or as a drug unapproved for its intended use."[65]

176. The reason that was the central question is Section 1107's prohibition against forcing military personnel to take the anthrax vaccine depended on the vaccine's status: Was it an investigational new drug or a drug unapproved for its intended use? Or was it FDA-approved for its use?

177. After reviewing the anthrax vaccine's unclear regulatory history, the court concluded it was "an investigational drug and a drug being used for an unapproved purpose."[66]

178. Applying *Rumsfeld #1* to the CMS Vaccine Mandate, the COVID-19 vaccines now available are experimental investigational new drugs, still in the

---

[63] *Doe v. Rumsfeld,* 341 F. Supp. 2d 1 (D.D.C. 2004) *at* 135.
[64] *Doe v. Rumsfeld,* 297 F. Supp. 2d 119 (D.D.C. 2003) *at* 125.
[65] *Doe v. Rumsfeld,* 297 F. Supp. 2d 119 (D.D.C. 2003) *at* 131.
[66]*Doe v. Rumsfeld,* 297 F. Supp. 2d 119 (D.D.C. 2003), *at* 135.

clinical trial phase, which are unapproved products, and are not licensed by the FDA for any indication.

179.    That conclusion made it easy for the court to grant a preliminary injunction halting DoD's anthrax vaccination program: "As a result of this status, DoD is in violation of 10 USC § 1107" because that statute prohibits forced vaccination with investigational, unapproved vaccines. "Thus, because the plaintiffs are likely to prevail on the merits…[they] meet the requirements for a preliminary injunction."[67]

180.    The right to refuse an experimental investigational vaccine still in the clinical trial phase, is recognized in both *Rumsfeld #1* and *Rumsfeld #2.*

### *Additional Regulatory Failures*

181.    The FDA failed to convene its outside expert panel to deliberate on the PFIZER Comirnaty licensure.

182.    The FDA asserted in its licensure letter to PFIZER: "We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion."

---

[67] *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003), *at* 135.

183.    The FDA deliberately misled the Posterity of the People of the United States
by confusing the words approval *(implying licensure)* and authorization *(not
licensed)*. "The EUA will continue to cover adolescents 12 through 15 years of
age and the administration of a third dose to certain immunocompromised
individuals 12 years of age and older. Additionally, for logistical reasons, the
EUA will continue to cover the use of the PFIZER-BioNTech COVID 19
Vaccine in individuals 16 years of age and older; this use is also now
approved." Even worse, the EUA currently reaches all the way down to
individuals 6 months of age and older.

184.    The EUA shields manufacturers from liability for both "[a]n unapproved
drug, biological product, or device used under an EUA issued by FDA; or [a]n
approved drug, biological product, or device used pursuant to Federal law in
conditions that are inconsistent with its approval."

185.    FDA's representation that licensure of its Comirnaty vaccine does not "raise
concerns or controversial issues" is transparently false. Although WOODCOCK
and the FDA have gone to great lengths to obscure this plain subversion of law,
their actions speak for themselves.

186.    PFIZER cannot unlawfully reap the benefits of licensure and EUA status
simultaneously, even if the FDA says it can. This clearly violates Congress'
intent regarding emergency medical countermeasures.

187. The FDA has indulged PFIZER to "have it both ways." PFIZER now enjoys the imprimatur of safety, effectiveness and legality from a license while retaining the blanket liability shield of an EUA product.

188. The documents the FDA made public regarding these decisions contain tortured, barely comprehensible language that fails to explain the "legally distinct" differences between the PFIZER vaccines with differing labels and designations. How can vaccines under EUA and license be "interchangeable" yet "legally distinct?"[68]

189. This linguistic smokescreen almost certainly conceals the fact that the available EUA product, PFIZER-BioNTech, has a priceless PREP Act liability shield while the unavailable, licensed vaccine, Comirnaty, does not rightfully have that shield.

190. Once the FDA licensed the Comirnaty vaccine for those 16 and older, it was legally obliged to revoke the EUAs for the other COVID vaccines for this age group. Yet it failed to do so.

191. The new Comirnaty vaccine cannot also be authorized for emergency use for the first two doses of vaccines in adults since this is its licensed indication.

192. The PFIZER Comirnaty vaccine should be subject to ordinary product liability when used for the first two doses of the vaccine for adults.

---

[68] *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003), *at* 135.

193.  Coverage under the Vaccine Injury Compensation Program, which will eventually afford the Comirnaty vaccine substantial liability protection, only occurs when (a) the vaccine is recommended by the CDC for routine administration to children and/or pregnant women; (b) Congress enacts an excise tax on the vaccine; and (c) HHS adds the vaccine to the Vaccine Injury Table through publication of a notice of coverage in the Federal Register.

194.  The FDA is creating legal cover for licensed vaccine mandates while gifting PFIZER a bullet-proof liability shield that comes only with an EUA. It has tried to please two masters: the Executive Branch, which has insisted on licensed vaccines for pervasive mandates, and PFIZER, which demanded indemnification from any vaccine-related injuries and deaths. But the FDA seems to have forgotten its ultimate one true master: the Posterity of the People of the United States who are sovereign joint-heirs to the 1787 Constitution.

195.  While the FDA may argue that PFIZER's Comirnaty vaccine is currently unavailable in the United States, and thus it is not in violation of the law as the licensed alternative must be "available," this argument is specious. PFIZER's Comirnaty vaccine is its primary product in Europe; if its two "interchangeable" vaccines are truly so, then PFIZER can relabel its EUA PFIZER BioNTech vials with Comirnaty labels or vice versa.

42

196.   The FDA makes excuses for PFIZER's lack of availability in its 8/23/2021 letter to PFIZER stating that "there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA." (Exhibit 4, n. 9)

197.   Either PFIZER's vaccine for those 6 months and up is licensed or it's not; either it's EUA, or it's not. It clearly contradicts the law for this product to be both licensed and authorized simultaneously. Such trickery undermines the public's already anemic confidence in the various agencies of the federal government.

198.   The FDA has arbitrarily and capriciously allowed PFIZER to play "bait and switch": to represent that PFIZER vaccines are licensed and available while selling off its inventory of experimental vaccines that enjoy blanket liability protection. These FDA actions are arbitrary, capricious, and illegal.

199.   The FDA's licensure of the PFIZER Comirnaty vaccine triggered employer, military, educational and institutional mandates across the country, coercing millions of healthy individuals to take unwanted, risky medical interventions created using aborted babies and resulting in the death of thousands of healthy People of the United States.

200.   These mandates are creating myriad economic dislocations, including in healthcare, air travel, education, and law enforcement. Millions will be forced

43

out of jobs and institutions rather than submit to potentially injurious medical interventions with substances that many would consider to be vile.

201.    While the finding of "arbitrary and capricious" agency action is a high bar, and courts are appropriately reluctant to second guess administrative action, there are times when justice demands judicial action.  Now is such a time.

### *CMS's Cited Statutory Authority*

202.    CMS's alleged statutory authority for its CMS vaccine mandate rests on two sets of laws.[69]

203.    First, it relies on two statutes that grant general rulemaking power to HHS. *Id.* Second, it relies on more specific statutes that purportedly give it authority to apply the CMS vaccine mandate to the specific covered classes of healthcare facilities.[70]

204.    The two statutes that grant general rulemaking power to HHS are in the SSA.  The first— 42 USC § 1302(a)—provides that "the [HHS] Secretary . . . shall make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which [he] is charged under this Act."

205.    The second— 42 USC § 1395hh(a)(1)—states that the "Secretary shall prescribe such regulations as may be necessary to carry out the administration

---

[69] 86 Fed. Reg. at 61,567.
[70] 86 Fed. Reg. at 61,567.

of the insurance programs under" Title 18 of the Social Security Act (SSA) (Medicaid).

206.    These statutes do not declare that the secretary may mandate nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

207.    CMS cites one specific statute to support its inclusion of Psychiatric Residential Treatment Facilities ("PRTFs") in the vaccine mandate. That statute—42 USC § 1396d(h)(1)(B)(i)—defines the term "inpatient psychiatric hospital services for privates under age 21" to "include[] only . . . inpatient services which . . . involve active treatment which meets such standards as may be prescribed in regulations by the Secretary."

208.    42 USC § 1396d(h)(1)(B)(i) implies that the secretary may create regulations setting "standards" for the "active treatment" of privates under age 21 needing inpatient psychiatric services.

209.    42 USC § 1396d(h)(1)(B)(i) does not declare that the secretary may impose mandatory nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

210.    CMS cites one specific statute to support its inclusion of Intermediate Care Facilities for Privates with Intellectual Disabilities ("ICFs-IID") in the vaccine mandate. That statute—42 USC § 1396d(d)(1)—defines those facilities to mean

an institution whose "primary purpose . . . is to provide health or rehabilitative services for [intellectually disabled] privates" if "the institution meets such standards as may be prescribed by the Secretary."

211.   42 USC § 1396d(d)(1) implies that the secretary may create standards concerning the kinds of "health or rehabilitative services" the facility provides. But 42 USC § 1396d(d)(1) does not declare that the secretary may impose mandatory nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

212.   CMS cites one specific statute to support its inclusion of Critical Access Hospitals ("CAHs") in the vaccine mandate. That statute—42 USC § 1395i–4(e)—says that "[t]he Secretary shall certify a facility as a critical access hospital if the facility—(1) is located in a State that has established a Medicare rural hospital flexibility program; (2) is designated as a critical access hospital by the State in which it is located; and (3) meets such other criteria as the Secretary may require."

213.   42 USC § 1395i–4(e) implies that the secretary may create "other criteria" similar to the two expressly listed requirements. But 42 USC § 1395i–4(e) does not declare that the secretary may impose mandatory nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

46

214. CMS cites one specific statute to support its inclusion of End-Stage Renal Disease ("ESRD") facilities in the vaccine mandate. That statute—42 USC § 1395rr(b)(1)(A)—authorizes payments for end-stage renal disease services to "providers of services and renal dialysis facilities which meet such requirements as the Secretary shall by regulation prescribe for institutional dialysis services and supplies . . . , transplantation services, self-care home dialysis support services which are furnished by the provider or facility, and routine professional services performed by a physician during a maintenance dialysis episode . . . ."

215. 42 USC § 1395rr(b)(1)(A) acknowledges that the secretary may create "requirements" for "institutional dialysis services," "transplantation services," and the like. But 42 USC § 1395rr(b)(1)(A) does not declare that the secretary may impose mandatory nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

216. CMS cites a few specific statutes to support its inclusion of Ambulatory Surgical Centers ("ASCs") in the vaccine mandate. The main statute that CMS cites—42 USC § 1395k(a)(2)(F)(i)—provides that Medicaid benefits shall include payments for "services furnished in connection with surgical procedures specified by the Secretary . . . performed in an ambulatory surgical center

*(which meets health, safety, and other standards specified by the Secretary in regulations)*."

217.   Though 42 USC § 1395k(a)(2)(F)(i) implies that the secretary may create regulations setting "health, safety, and other standards," it does not declare that the secretary's regulatory power is so broad that he may mandate nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

218.   CMS cites two specific statutes to support its inclusion of Programs of All-Inclusive Care for the Elderly ("PACE") facilities in the vaccine mandate. The first— 42 USC § 1395eee(f)—provides that "[t]he Secretary shall issue interim final or final regulations to carry out this section," and that "[n]othing in this subsection shall be construed as preventing the Secretary from including in regulations provisions to ensure the health and safety of privates enrolled in a PACE program." The second— 42 USC § 1396u–4(f)—is materially indistinguishable in its relevant language. Though these statutes authorize the secretary to adopt some health- and safety related regulations, they do not declare that the secretary's regulatory power is so broad that he may mandate nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

219. CMS cites two specific statutes to support its inclusion of long-term-care ("LTC") facilities in the vaccine mandate. The first— 42 USC § 1395i–3(d)(4)(B)—states that "[a] skilled nursing facility must meet such other requirements relating to the health, safety, and well-being of residents or relating to the physical facilities thereof as the Secretary may find necessary." The second— 42 USC § 1396r(d)(4)(B)—likewise provides that "[a] nursing facility must meet such other requirements relating to the health and safety of residents or relating to the physical facilities thereof as the Secretary may find necessary." The expressly listed qualifying factors include the types of services provided, staff qualifications, licensing requirements, sanitation issues, and administrative matters. These statutes thus do not give the secretary the power to mandate nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

## *The CMS vaccine mandate Harmed Spencer*

220. Spencer has an interest in protecting himself from discriminatory policies.

221. The government, consistent with the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of

affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.[71]

222.    The CMS vaccine mandate furnished the legal basis on which the State Defendants relied in furtherance of an unconstitutional scheme to compel vaccine uptake by means of maladministering civil rights, privileges, and capacities on account of opinions or belief concerning matters of religion, contrary to the fundamental right of conscience guaranteed by the Michigan Constitution.[72]

223.    Spencer was injured because the CMS vaccine mandate discriminates between persons who choose to be vaccinated and those who, like him, are completely healthy but raise religious and/or medical objections to being compelled to receive injections into their body of experimental substances created using aborted babies.

224.    Even where there is no 'right' to a valuable governmental benefit and even though the government may deny benefits for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit on a basis that infringes constitutionally protected interests — especially the interest in free exercise of religion. For if the government could deny a benefit to a person because of their constitutionally protected freedom of

---

[71] *Church of the LukuMichigan Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).
[72] Const.1963, Art. I, § 4.

religion or associations, their exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly. "Such interference with constitutional rights is impermissible."[73]

### *Arbitrary and Capricious Action in Excess of Authority*

225.  CMS's adoption and promulgation of President Biden's Executive Order through the CMS vaccine mandate is a major agency action that could not lawfully be conducted without strict adherence to the APA.

226.  The Federal Defendants, jointly and severally, each knew that the APA is well-settled law.

227.  None of the statutes that CMS cited authorized its CMS vaccine mandate. This includes the two statutes that grant general rulemaking power to HHS—42 USC § 1302(a) and 42 USC § 1395hh(a)(1)—and the more than a dozen specific statutes that CMS invoked in support of its mandate.

228.  The CMS vaccine mandate is unprecedented—never before has CMS tried to use its rulemaking authority to mandate nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States. This confirms that CMS acted contrary to law and in excess of statutory authority.

---

[73] *Perry v Sinderman,* 408 U.S. 593 (1972).

229.    Reading CMS's statutory authority to include the police power to mandate nonconsensual invasive experimental medical procedure throughout an industry violates the:

    A. Supreme Court's major-questions doctrine.[74]

    B. Nondelegation doctrine.[75]

    C. Spending Clause.

    D. Tenth Amendment by trampling on the traditional authority of the States or the People to regulate public health within their borders, including the topic of compulsory nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.[76]

### *Failure to Reasonably Consider Crucial Factors*

230.    Congress requires that courts "shall hold unlawful and set aside" any agency "action," "finding," or "conclusion" whenever the agency failed to follow the necessary process for reasoned decision-making.[77]

---

[74] *See Alabama Ass'n of Realtors v. Dept. of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021) at 2489 *(per curiam)* ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (cleaned up); *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

[75] *See Gundy v. United States,* 139 S. Ct. 2116 (2019) at 2123 *(plurality op.)* (Congress must provide an "intelligible principle to guide the delegee's use of discretion" in the exercise of delegated power).

[76] *See Alabama Ass'n of Realtors v. Dept. of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021) at 2489 ("[Supreme Court] precedents require Congress to enact exceedingly plain language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property.").

[77] 5 USC 706(2)(A).

231.   Under the arbitrary and capricious standard, a court must determine "whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."[78]

232.   This standard of review is narrow; however, notwithstanding, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[79] If the agency's interpretation is reasonable, the court must uphold it even if the court would have reached a different interpretation had that issue first been presented to it.[80] However, the court must reject administrative constructions that are inconsistent with a statutory mandate, frustrate congressional policy, or, otherwise, not supported by "substantial evidence on the record considered as a whole."[81]

233.   The APA protects the Posterity of the People of the United States from arbitrary and capricious action by imposing the rule of reason and the rule of law through judicial oversight.

234.   An agency is "required to engage in reasoned decision making."[82] This requires that the agency "articulate a satisfactory explanation for its action."[83]

---

[78] *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto, Ins. Co.,* 463 U.S. 29 (1983) at 43.

[79] *Id.* (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962) at 168.

[80] *Udall v Tallman,* 380 U.S. 1 (1965) at 16.

[81] *Federal Election Com. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27 (1981) at 29-33; *See also Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto, Ins. Co.,* 463 U.S. 29 (1983) at 44.

[82] *Michigan v. EPA,* 576 U.S. 743 (2015) at 750.

[83] *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto, Ins. Co.,* 463 U.S. 29 (1983) at 23.

235.  This agency process requires the Federal Government Defendants to articulate clear rationales for decisions, especially when their actions are bound to lead to a medical mandate for millions of people.[84]

236.  When courts abandon this standard of oversight, the People are at grave risk. If pressure from lobbyists and stockholders rush regulators to license a biologic and violate the law, debacles predictably unfold and tragedies result.

237.  A "reasonable time for agency action is typically counted in weeks or months, not years,"[85] and an agency action's exigent context may demand expedited review.[86]

238.  On 3/17/2020 HHS published its 2/04/2020 declaration pursuant to 42 USC §§ 247d-6d(a) and 247d-6d(b)(1) to establish PFIZER's statutory immunity.

239.  The APA forbids federal administrative agencies from relying on *post hoc* rationalizations.[87]

240.  CMS's conclusion that the CMS vaccine mandate is necessary was a *post hoc* rationalization because nearly two months before the CMS vaccine mandate issued, President Biden's Executive Order instructed CMS to adopt a rule mandating vaccination for healthcare workers.

---

[84] *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962) at 158.
[85] *In re Am. Rivers & Idaho Rivers United,* 372 F.3d 413 (D.C. Cir. 2004) at 419.
[86] *Fund for Animals v. Norton,* 294 F.Supp.2d 92 (D.D.C. 2003) at 114 ("pressing human health concerns...demand prompt review").
[87] *Dept. of Homeland Security v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1907, 1909 (2020) (holding that it is a "foundational principle of administrative law" to reject an agency's "impermissible *post hoc* rationalizations") (quoting *Michigan v. EPA,* 576 U.S. 743 (2015)).

241.   The APA requires federal administrative agencies to engage in "reasoned decision-making."[88]

242.   Agency action is thus "lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem."[89]

243.   Failing to consider—or arbitrarily rejecting—crucial factors affecting the efficacy of a policy renders agency action arbitrary and capricious.

244.   CMS did not engage in reasoned decision-making in concluding that the vaccine mandate was necessary to protect patient health and safety and that the mandate will not exacerbate the endemic staff shortages that already exist for almost all categories of employees at almost all kinds of health care providers.

245.   CMS ignored or arbitrarily rejected important aspects of the issue and relevant factors, including but not limited to: (a) the administration of constitutional rights, (b) economic impacts on the healthcare industry, (c) labor-force disruptions in the healthcare industry, (d) loss of jobs in the healthcare industry, (e) costs to States and their agencies, (f) the current health risks of COVID-19, (g) the admitted current limitations of COVID-19 vaccines, (h) the acknowledged benefits of natural immunity to COVID-19, (i) the number of injuries including the several thousands of deaths resulting from the experimental vaccines reported on VAERS, and (j) basic distinctions among

---

[88] *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) at 379 (cleaned up).
[89] *Michigan v. EPA*, 576 U.S. 743 (2015) at 750-752 (cleaned up).

workers such as those with natural immunity to COVID-19 and those who work with limited in-person contacts.

246.    CMS ignored or arbitrarily rejected the adverse effects of resignations among unvaccinated healthcare workers, which is a particularly important problem in this stagnated economy already experiencing a critical labor shortage in healthcare.

247.    CMS ignored or arbitrarily rejected the adverse effects of resignations among unvaccinated healthcare workers, which is a particularly important problem in our failing rural communities.

248.    CMS ignored or arbitrarily rejected the adverse effects of denied equal opportunity employment among unvaccinated healthcare workers, which is a particularly important problem in our failing rural communities.

249.    CMS ignored or arbitrarily rejected the adverse effects on States, which operate state-run hospitals that participate in Medicare and Medicaid, and which incur costs associated with enforcing the CMS Vaccine Mandate, including enforcement through state surveyors.

250.    CMS ignored or arbitrarily rejected the fact that the CMS Vaccine Mandate will have a disparate impact on minority and poor communities that have relatively low rates of vaccination by inflicting disproportionately greater

unemployment, job losses, loss of healthcare services, and economic injury on those disadvantaged communities.

251.   CMS ignored or arbitrarily rejected the interests of healthcare workers and potential healthcare workers who—for any number of varying personal reasons—do not want to take one of the experimental COVID-19 vaccines.

252.   CMS ignored that the CMS Vaccine Mandate will cover religious healthcare institutions and thus require them to terminate ministerial employees in violation of the First Amendment.[90]

253.   CMS ignored that its actions were contrary to law, as they were not authorized by the SSA, and were also unconstitutional, as the CMS Vaccine Mandate violates not only the Free Exercise Clause, but also the Tenth Amendment by usurping Michigan's retained police power over compulsory experimental vaccinations.

254.   CMS acted arbitrarily and capriciously by refusing to provide a testing option for employees and potential employees who decline to take one of the experimental COVID-19 vaccines. This decision arbitrarily and capriciously conflicts with OSHA's recently issued ETS, which allows periodic testing as an alternative to nonconsensual invasive experimental medical procedure.

---

[90] *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049 (2020) at 2061.

255.   CMS acted arbitrarily and capriciously by refusing to provide an exemption to persons with natural immunity to COVID-19 because natural immunity is at least as effective as the experimental vaccines in preventing re-infection, transmission, and severe health outcomes.

256.   CMS acted arbitrarily and capriciously by refusing to provide an exemption to persons objecting on bodily autonomy grounds because the federal government has no police power over the Posterity of the People of the United States.

257.   CMS's finding that the CMS Vaccine Mandate is necessary was pretextual because the mandate is a blatant attempt to federalize a state's police power over public health and private autonomy issues involving nonconsensual invasive experimental medical procedure to be performed on any of the Posterity of the People of the United States.

258.   CMS's finding that the CMS Vaccine Mandate is necessary was undermined by its delay in adopting it. The experimental vaccines had been authorized for almost a year, yet CMS did not impose the CMS Vaccine Mandate until two months after it was instructed to do so by the President as part of his "six-point plan" to usurp the police power reserved to the several States to regulate public health and private autonomy issues.

259.    CMS acted arbitrarily and capriciously by ignoring or unreasonably rejecting the important reliance interests of many institutions and privates. These reliance interests are longstanding and deep-seated since the federal government has never before tried to impose an experimental vaccine requirement on healthcare workers.

260.    These specific reliance interests include (a) the State's reliance interests in their healthcare providers continuing to operate under the existing rules without facing this new mandate that threatens to cause significant harm to the Posterity of the People of the United States, particularly those in rural communities; (b) healthcare providers' similar reliance interests in staffing their facilities under the existing rules without facing this new mandate that threatens their workforce, the services they provide, and their very existence; and (c) healthcare workers' reliance interests, especially the interests of minority workers in rural communities, in selecting a job and building a career under the existing rules.

261.    The broad scope of healthcare providers covered by the CMS Vaccine Mandate is arbitrary and capricious. The mandate reaches many categories of healthcare facilities, such as psychiatric residential treatment facilities for privates under 21 years of age,[91] that are not related to CMS's asserted interest

---

[91] See 86 Fed. Reg. at 61576.

in protecting elderly and weakened patients from the transmission of COVID-19.

262.    The broad scope of workers, volunteers, and contractors covered by the CMS experimental vaccine mandate is arbitrary and capricious. The vast reach of this mandate is far removed from the purported purpose of protecting patient safety.

263.    CMS admitted that "currently there are endemic staff shortages for almost all categories of employees at almost all kinds of health care providers and supplier[s]."[92]

264.    "1 in 5 hospitals," CMS noted, "report that they are currently experiencing a critical staffing shortage."[93]

265.    In addition, "approximately 23 percent of [long-term-care] facilities report … a shortage in nursing aides; 21 percent report … a shortage of nurses; and 10 to 12 percent report … shortages in other clinical and non-clinical staff categories."[94]

266.    It is thus not surprising, CMS relayed, that "[o]ver half (58%) of nursing homes participating in a recent survey . . . indicated that they are limiting new admissions due to staffing shortages."[95]

---

[92] 86 Fed. Reg. at 61,607.
[93] 86 Fed. Reg. at 61,559
[94] 86 Fed. Reg. at 61,559
[95] 86 Fed. Reg. at 61,559

267.    In creating the rule, CMS was "aware of concerns about health care workers choosing to leave their jobs rather than be vaccinated" and knew that "there might be a certain number of health care workers who choose to do so."[96]

268.    In fact, CMS reported that "a large long term care association" recently issued a policy statement observing that "some in the sector fear that a vaccine mandate could lead to worker resignations."[97]

269.    But CMS dismissed these concerns because "there is insufficient evidence to quantify" them.[98]

270.    Instead, CMS optimistically "believe[d] that the COVID-19 vaccine requirements . . . will result in nearly all health care workers being vaccinated."[99]

271.    CMS repeatedly admitted that the current "endemic staff shortages . . . may be made worse if any substantial number of unvaccinated employees leave health care employment altogether."[100]

272.    CMS also recognized that these staffing concerns apply even if providers do not lose a substantial number of employees. In fact, "[e]ven a small fraction" of

---

[96] 86 Fed. Reg. at 61,559
[97] 86 Fed. Reg. at 61,565-66.
[98] 86 Fed. Reg. at 61,569.
[99] Id.: *see also at* 61,609 (finding that only a "relatively small fraction" of turnover "will be due to vaccination").
[100] *At* 61,607; see also *at* 61,608 ("[T]here may be disruptions in cases where substantial numbers of health care staff refuse vaccination and are not granted exemptions and are terminated, with consequences for employers, employees, and patients"), *at* 61,609 ("[I]t is true that compliance with this rule may create some short-term disruption of current staffing levels for some providers or suppliers in some places.").

61

what CMS called "recalcitrant unvaccinated employees" who decline to take a vaccine "could disrupt facility operations."[101]

273.    CMS additionally recognized facts indicating that potential disaster awaits rural communities, including minority health-care workers in those communities. CMS acknowledged that "vaccination rates are disproportionately low among nurses and health care aides" in rural locations and other "communities that experience social risk factors."[102]

274.    And it admitted that "early indications are that rural hospitals are having greater problems with employee vaccination . . . than urban hospitals."[103]

275.    In addition, CMS observed that "nurses and aides in these [rural and other underprivileged] settings are more likely to be members of racial and ethnic minority communities."[104]    This meant that minority workers in rural communities were among the most likely groups to lose their jobs under the mandate.

276.    CMS nonetheless dismissed these workforce concerns because it thought that the unvaccinated employees would get jobs in other healthcare positions,

---

[101] 86 Fed. Reg. at 61,612.
[102] 86 Fed. Reg. at 61,566.
[103] 86 Fed. Reg. at 61,613.
[104] 86 Fed. Reg. at 61,566.

such as "physician and dental offices," that are not covered by the CMS vaccine mandate.[105]

277.    Yet this speculation does nothing to abate the debilitating losses threated to the healthcare facilities falling under this mandate. It does not suggest that the healthcare worker shortage will disappear but only that shortages will be further concentrated among the healthcare facilities covered by the CMS Vaccine Mandate.

278.    CMS also conjectured that staffing deficiencies at facilities covered by the mandate "might be offset by persons returning to the labor market who were unwilling to work at locations where some other employees are unvaccinated and hence provide some risk … to those who have completed the primary vaccination series for COVID–19."[106]

279.    This was pure speculation. CMS cited no evidence that such vaccinated workers exist. In any event, a worker who harbored such fears would still have to continually work with unvaccinated patients, and it is irrational to assume that they would be willing to work with unvaccinated patients but not unvaccinated co-workers.

---

[105] 86 Fed. Reg. at 61,607.
[106] 86 Fed. Reg. at 61,607.

280.   CMS additionally dismissed workforce shortage concerns by assuming "a dynamic labor market" where "net employment opportunities . . . do not change."[107]

281.   But an industry with admittedly "endemic staff shortages"[108] is not a dynamic labor market. Net employment opportunities in the existing healthcare industry can and do change. Indeed, if the CMS vaccine mandate drives out enough employees from particular facilities, those facilities might be forced to close certain divisions, cancel certain services, or shutter altogether—any of which would decrease net employment opportunities.

282.   If CMS is wrong in its optimism that "nearly all health care workers" will submit to the mandate, the results will be disastrous.[109]

283.   CMS itself concluded that approximately 2.4 million healthcare workers will get vaccinated under this CMS vaccine mandate in the first year.[110]

284.   If even 10 percent of those workers decline vaccination, the healthcare industry will lose over 200,000 employees, dealing a devastating blow to an already struggling industry.[111]

285.   Further confirming that this vaccine mandate threatens grave staffing concerns, CMS observed that many healthcare workers decline other vaccines.

---

[107] 86 Fed. Reg. at 61,608 (finding "no reason to believe" that "net employment opportunities" will "change").
[108] 86 Fed. Reg. at 61,607.
[109] 86 Fed. Reg. at 61,569.
[110] 86 Fed. Reg. at 61,603.
[111] 86 Fed. Reg. at 61,606.

It did so by noting that "studies on annual seasonal influenza vaccine uptake consistently show that half of health care workers may resist seasonal influenza vaccination nationwide."[112]

286. Despite the very real concerns about the vaccine mandate pushing many healthcare workers out of their jobs, CMS remarkably concluded that existing staffing shortages are actually a reason to impose the mandate. In CMS's words, "the urgent need to address COVID-related staffing shortages that are disrupting patient access to care[] provides strong justification as to the need to issue this" mandate.[113]

287. Because "unvaccinated staff" are "at greater risk for infection" and "absenteeism," CMS elaborated, allowing providers to continue hiring them might "create staffing shortages."[114]

288. But this speculation ignores the obvious fact that maintaining a larger pool of potential workers, even if some might have a bout with COVID-19, is better than categorically excluding a class of privates. It also ignores the obvious well-known fact that even the vaccinated contract COVID-19 and pass it on.

289. By flagrantly bypassing federal law, the FDA has failed to follow reasoned decision-making.

---

[112] 86 Fed. Reg. at 61,568.
[113] 86 Fed. Reg. at 61,567.
[114] 86 Fed. Reg. at 61,559.

## *Failure To Provide Notice And Receive Comment 42 USC § 1395hh*

290.    HHS, which includes CMS, is subject to the procedural rulemaking requirements in the SSA.

291.    Under the SSA, CMS "shall provide for notice of [a] proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."[115]

292.    Prior to publishing the CMS vaccine mandate, CMS did not publish notice of proposed rulemaking in the Federal Register or give all interested members of the public an opportunity to comment.

293.    The SSA's notice and comment requirements, like the APA's similar requirements, do not apply if "good cause" establishes that they "are impracticable, unnecessary, or contrary to the public interest" under the circumstances.[116]

294.    CMS recognized that governing statutes require the secretary to "consult with appropriate State agencies" when determining the "conditions of participation by providers of services,"[117] and that no such consultation occurred before the [CMS vaccine mandate] issued.[118]

---

[115] 42 USC § 1395hh(b)(1).
[116] 42 USC § 1395hh(b)(2)(C) (invoking 5 USC § 553(b)(B)).
[117] 42 USC § 1395z.
[118] 86 Fed. Reg. at 61,567.

295.   Yet CMS claimed that it did not violate that statute because it "intend[s] to engage in consultations with appropriate State agencies . . . following the issuance of this rule," and it does not "understand the statute to impose a temporal requirement to do so in advance of the issuance of this rule."[119]

296.   CMS recognized that the APA[120] and the SSA,[121] ordinarily require notice and a comment period before a rule like this one takes effect.[122]

297.   But CMS "believe[d] it would be impracticable and contrary to the public interest . . . to undertake normal notice and comment procedures."[123]   It thus found "good cause to waive" those procedures.[124]

298.   Trying to justify its good cause finding, CMS stated that "[t]he data showing the vital importance of vaccination" indicates that it "cannot delay taking this action."[125]

299.   But CMS did not reconcile that finding with its acknowledgement that "the effectiveness of the vaccine[s] to prevent disease transmission by those vaccinated [is] not currently known."[126]

---

[119] 86 Fed. Reg. at 61,567.
[120] 5 USC § 553.
[121] 42 USC 1395hh(b)(1).
[122] 86 Fed. Reg. at 61,583.
[123] 86 Fed. Reg. at 61,586.
[124] 86 Fed. Reg. at 61,586.
[125] 86 Fed. Reg. at 61,583.
[126] 86 Fed. Reg. at 61,615.

300. CMS recognized that although summer brought a Delta-variant-driven COVID-19 surge, "newly reported COVID–19 cases, hospitalizations, and deaths have begun to trend downward at a national level."[127]

301. Yet CMS still sought to immediately impose the vaccine mandate because it claimed, without citing any support, that "there are emerging indications of potential increases in . . . northern states where the weather has begun to turn colder."[128]

302. CMS also asserted that it must immediately implement the [CMS vaccine mandate] because "the 2021–2022 influenza season" will soon begin.[129]

303. CMS offered this justification while simultaneously admitting that "the intensity of the upcoming 2021–2022 influenza season cannot be predicted" and that "influenza activity during the 2020–2021 season was low throughout the U S."[130]

304. In claiming that it must immediately implement the CMS vaccine mandate, CMS ignored that it waited almost two months after President Biden's directive before it promulgated President Biden's Executive Order to the public.

305. Despite attempts to do so, CMS failed to demonstrate that "good cause" excuses its failure to conduct notice-and-comment rulemaking.

---

[127] 86 Fed. Reg. at 61,583.

[128] 86 Fed. Reg. at 61,584

[129] 86 Fed. Reg. at 61,584

[130] 86 Fed. Reg. at 61,584.

## _Failure to Prepare Regulatory Impact Analysis 42 USC § 1302_

306.   The APA requires a federal agency to publish "notice of proposed rulemaking . . . in the Federal Register" and then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."[131]

307.   The APA's notice and comment requirements do not apply if "good cause" establishes that they "are impracticable, unnecessary, or contrary to the public interest" under the circumstances.[132]

308.   42 USC § 1302(b)(1) provides that "[w]henever the Secretary publishes a general notice of proposed rulemaking for any rule or regulation proposed under subchapter XVIII, subchapter XIX, or part B of [title IX of the SSA] that may have a significant impact on the operations of a substantial number of small rural hospitals, the Secretary shall prepare and make available for public comment an initial regulatory impact analysis."

309.   42 USC § 1302(b)(1) controls the CMS vaccine mandate because CMS's cited statutory authority for its experimental vaccine mandate falls under Titles 18 and 19 of the SSA and because the mandate will have a significant impact on the operations of a substantial number of small rural hospitals.

---

[131] 5 USC § 553(b)–(c).
[132] 5 USC § 553(b)(B).

69

310. Prior to publishing the CMS vaccine mandate, the secretary did not publish notice of proposed rulemaking in the Federal Register or give all interested members of the public an opportunity to comment.

311. Despite attempts to do so, the secretary failed to demonstrate that "good cause" excuses his failure to conduct notice-and-comment rulemaking.

312. The CMS vaccine mandate threatens to exacerbate already devastating shortages in healthcare staffing by forcing small rural hospitals to terminate their unvaccinated workers and deny equal opportunity employment. That, in turn, will compel those hospitals to close certain divisions, cancel certain services, or shutter altogether. These dire consequences affect millions of the Posterity of the People of the United States, and their collective force required CMS to prepare a regulatory impact analysis.

### *Failure to Consult with Appropriate State Agencies 42 USC § 1395z*

313. 42 USC § 1395z provides that "the Secretary shall consult with appropriate State agencies and recognized national listing or accrediting bodies, and may consult with appropriate local agencies" when "carrying out his functions, relating to determination of conditions of participation by providers of services, under subsections (e)(9), (f)(4), (j)(15), (o)(6), (cc)(2)(I), and … (dd)(2), and (mm)(1) of section 1395x of this title, or by ambulatory surgical centers under section 1395k(a)(2)(F)(i) of this title."

70

314. 42 USC § 1395z controls the CMS vaccine mandate because that mandate purports to establish conditions of participation for (a) hospitals under 42 USC § 1395x(e)(9), (b) long term-care facilities (also known as skilled nursing facilities) under 42 USC § 1395x(j) and 42 USC § 1395i–3, (c) Home Health Agencies ("HHAs") under 42 USC § 1395x(o)(6), (d) Comprehensive Outpatient Rehabilitation Facilities ("CORFs") under 42 USC § 1395x(cc)(2), (e) hospices under 42 USC § 1395x(dd)(2), (f) Critical Access Hospitals ("CAHs") under 42 USC § 1395x(mm)(1) and (g) 42 USC § 1395i–4(e), and Ambulatory Surgical Centers ("ASCs") under 42 USC § 1395k(a)(2)(F)(i).

315. CMS admitted that it did not comply with 42 USC § 1395z's requirement that it "consult with appropriate State agencies."[133]

316. By failing to consult with appropriate States agencies before issuing the CMS vaccine mandate, CMS violated 42 USC § 1395z.

317. CMS's "inten[t] to engage in consultations with appropriate State agencies . . . following the issuance of th[e] rule,"[134] does not satisfy 42 USC § 1395z. The statute plainly requires that the consultation with States occur before a rule is issued. The statutory text demands the consultation when the secretary is

---

[133] 86 Fed. Reg. at 61,567.
[134] 86 Fed. Reg. at 61,567.

71

"carrying out his functions ... relating to determination of conditions of participation by providers of services."[135]

318.    The secretary, via CMS, already made his determination that the CMS vaccine mandate should be a condition of participation by providers. It was at that time he was required to consult with the States. Since he did not, the secretary, acting through CMS, violated 42 USC § 1395z.

## *Unlawful Supervision and Control 42 USC § 1395*

319.    42 USC § 1395 provides that nothing in Title 18 of the SSA "shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

320.    The CMS vaccine mandate violates 42 USC § 1395 because it authorizes federal officials at CMS to exercise "supervision" and "control" over the "selection" and "tenure" of employees *(including state employees)* and other persons "providing health services." It does so by prohibiting covered

---

[135] 42 USC § 1395z.

healthcare facilities from hiring unvaccinated employees and forcing those facilities to terminate—and thus end the tenure of—unvaccinated employees.

321.   The CMS vaccine mandate also violates that statute because it authorizes federal officials at CMS to exercise "supervision" and "control" over the "administration" and "operation" of institutions, agencies, and persons that provide health services (including state facilities and employees). It does so by dictating the hiring and firing policies of these institutions concerning unvaccinated workers.

### *Violation of Informed Consent Requirement 21 C.F.R. § 50.20*

322.   Because the COVID vaccines are an investigational product, approved for use under an EUA, federal law prohibits their administration to any person without informed consent.

323.   21 C.F.R. § 50.20 governs the protection of human subjects in the conduct of all clinical investigations regulated by the FDA and provides:

> "Except as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

324.   No COVID-19 vaccine has completed Phase III trials; thus, all COVID-19 vaccines remain in the clinical investigation stage.

325.   None of the exemptions provided in sections 50.23 and 50.24 apply to Spencer.

### *Unconstitutional Exercise of the Spending Power*

326.   "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."[136]    Stated differently, the Constitution does not tolerate the federal government dragooning state employees "into administering federal law."[137]

327.   The federal government cannot use the spending power to "commandeer a State's . . . administrative apparatus for federal purposes,"[138] or "conscript state [agencies] into the national bureaucratic army."[139]

328.   Mandatory compliance with the CMS vaccine mandate is thus an unconstitutional precondition placed on THE MAPLES' receipt of federal funds.

329.   Nothing in federal law gave the States notice that forcing their employees at state-run hospitals to participate in invasive experimental medical procedure, or forcing State surveyors to enforce the CMS vaccine mandate, would be a condition on the State's receipt of federal funds. [140]

---

[136] *Printz v. United States,* 521 U.S. 898 (1997) at 925.
[137] *Printz v. United States,* 521 U.S. 898 (1997) *at* 928.
[138] *NFIB v. Sebelius,* 567 U.S. 519 (2012) at 577,
[139] *NFIB v. Sebelius,* 567 U.S. 519 (2012) at 585.
[140] *Pennhurst State School v. Halderman,* 451 U.S. 1 (1981). ("[I]f Congress intends to impose a condition on the grant of federal monies, it must do so unambiguously," so "States [can] exercise their choice knowingly.")

74

330.   The scope of the CMS vaccine mandate reaches far beyond a federal interest in patient safety.[141]   It also covers healthcare providers, such as psychiatric residential treatment facilities for privates under 21 years of age, that exclusively serve patients at exceptionally minimal risk from COVID-19.[142]

331.   This vast reach of the CMS vaccine mandate is far removed from the supposed purpose of protecting patients whose healthcare providers receive federal funding.

332.   The CMS vaccine mandate conscripts state agencies by forcing state-run hospitals that fall under the mandate to either treat their unvaccinated employees disparately or give up all their Medicare and Medicaid funding.

333.   The CMS vaccine mandate conscripts state agencies by forcing state surveyors to enforce the mandate through verifying healthcare providers' compliance with it. If States instruct their surveyors not to enforce the CMS vaccine mandate, that will result in the disqualification of Medicare- and Medicaid-certified providers and suppliers in their State.

334.   Forcing the several State governments to administer the CMS vaccine mandate or else jeopardize all Medicare and Medicaid funds flowing into their State from Federal City administrators is a gun to the head that compels the States to participate against their will, and to the derogation of the privileges,

---

[141] *Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009) at 650 ("[C]onditions on federal funds must be related to the federal interest in particular national projects or programs.")
[142] 86 Fed. Reg. at 61576

rights, and immunities enumerated under the Bill of Rights and delegated to the Posterity of the People of the United States.

## *Other Contradictions, Concessions, and Omissions*

335.   On 7/19/2021 the Vaccine Adverse Event Reporting System (VAERS) co-managed by the CDC and the FDA, confirmed 12,313 vaccine death reports and 1,148 reports of myocarditis or pericarditis among people ages 30 and younger who received a COVID-19 vaccine.

336.   The CMS Vaccine Mandate is inconsistent with statutory mandate, frustrates congressional policy or not supported by "substantial evidence on the record considered as a whole."[143]

337.   CMS "considered requiring daily or weekly testing of unvaccinated privates" instead of mandatory vaccination.[144] But it chose the vaccine mandate for one reason: because it believes that "vaccination is a more effective infection control measure."[145] In so doing, CMS failed to discuss how other countervailing considerations—such as workforce shortages and personal liberty considerations—factored into the rejection of the periodic testing option.

---

[143] *Federal Election Com. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27 (1981) at 29-33; *See also Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto, Ins. Co.,* 463 U.S. 29 (1983) at 44.
[144] 86 Fed. Reg. at 61,614.
[145] 86 Fed. Reg. at 61,614.

338.   Nor did CMS acknowledge the disparity between its rejection of testing and OSHA's recently issued Emergency Temporary Standard ("ETS"),[146] which allows regular testing as an adequate alternative.

339.   CMS "considered whether it would be appropriate to limit COVID-19 vaccination requirements to staff who have not previously been infected by SARS-CoV-2."[147]  Yet it decided against that option because it did not think that "infection-induced immunity, also called 'natural immunity'" is "equivalent to receiving the COVID-19 vaccine."[148]  But elsewhere, CMS recognized the value of natural immunity when it stated that each day 100,000 people are "recover[ing] from infection," that they "are no longer sources of future infections," and that their natural immunity "reduce[s] the risk to both health care staff and patients substantially."[149]

340.   CMS ignored key evidence indicating that natural immunity effectively guards against the Delta variant. In a study of a large population of patients in the State of Israel, vaccinated people who had not been previously infected had thirteen times higher odds of experiencing a breakthrough infection with the

---

[146] See COVID–19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (11/05/2021).
[147] 86 Fed. Reg. at 61,614.
[148] 86 Fed. Reg. at 61,559.
[149] 86 Fed. Reg. at 61,604.

Delta variant than patients who had recovered from COVID but were never vaccinated.[150]

341.    CMS repeatedly said, much like President Biden had in his 9/09/2021 speech, that the currently authorized COVID-19 vaccines are "highly effective at protecting vaccinated people against symptomatic and severe COVID-19."[151] However, CMS also recognized that "the effectiveness of the vaccine to prevent disease transmission by those vaccinated [is] not currently known."[152]

342.    CMS's various directives sent conflicting messages on "booster" or additional doses. On the one hand, CMS said that its mandate does not require "booster doses" or additional doses of the vaccine.[153]  But on the other hand, CMS included a "booster" jab in its cost calculations,[154] and acknowledged that "[s]ome in the scientific community believe that 'booster' vaccinations after 6 or 8 months would be desirable to maintain a high level of protection against the predominant Delta version of the virus,"[155]

343.    CMS appeared to be forecasting that if it has the power to mandate vaccines, it will eventually extend the mandate to include booster jabs.

---

[150] *Sevan Gazit et al.*  (Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: Reinfections versus breakthrough infections, MedRxiv Preprint (2021)),

[151] 86 Fed. Reg. at 61,560.

[152] 86 Fed. Reg. at 61,615.

[153] 86 Fed. Reg. at 61,563.

[154] 86 Fed. Reg. at 61,608.

[155] 86 Fed. Reg. at 61,609.

344. CMS recognized that vaccines, like all other medical interventions, are not without risks. "Serious adverse reactions also have been reported following COVID–19 vaccines," even though "they are rare."[156] These adverse reactions include "death," "anaphylaxis," "thrombosis," "myocarditis and/or pericarditis," to name a few.[157]

345. CMS never considered other important aspects of imposing its CMS vaccine mandate. Among those are the interests of healthcare workers who—for any number of varying personal reasons— do not want to take one of the experimental vaccines because the vaccines are created using aborted babies.

346. Non-compliant healthcare providers are "subject to enforcement remedies imposed by CMS depending on the level of noncompliance and the remedies available under Federal law (for example, civil money penalties, denial of payment for new admissions, or termination of the Medicare/Medicaid provider agreement)."[158]

347. It appears that a covered healthcare provider that flatly refuses to comply— or otherwise cooperate—with the CMS Vaccine Mandate will face termination of its Medicare/Medicaid provider agreement.[159]

---

[156] 86 Fed. Reg. at 61,565.

[157] 86 Fed. Reg. at 61,565.

[158] 86 Fed. Reg. at 61,574.

[159] 86 Fed. Reg. at 61,574 (noting that the available "remedies" include "termination of the Medicare/Medicaid provider agreement").*See also, Background Press Call on OSHA and CMS Rules for Vaccination in the Workplace (11/04/2021),* ("If a facility were not making steps to come into compliance, we have a range of remedies. . . We could . . . certainly, as a last resort, terminate them from the Medicare and Medicaid programs.").

## THE STATE DEFENDANTS

348.   THE MAPLES falls within the fifteen categories of Medicare- and Medicaid-certified providers and suppliers covered by the CMS Vaccine Mandate.

349.   The State Defendants, by virtue of custom or policy, have violated rights delegated to Spencer by the Michigan Constitution.   Thus, governmental immunity is not available to them in the state court action pleaded herein.[160]

350.   DEISCH directly or proximately caused injury to Spencer by directing DUBE and LOOP to enforce the CMS Vaccine Mandate at THE MAPLES.

351.   The State Defendants, jointly and severally, directly or proximately caused injury to Spencer by enforcing the CMS Vaccine Mandate against him in a manner that denied his rights set forth by the United States Constitution and Michigan Constitution.

352.   The State Defendants' experimental vaccine policy provides a mechanism for individualized exemptions.   The policy says that all employees are required to be fully vaccinated against COVID-19.   But the policy also provides that reasonable accommodations will be considered on an individual basis upon the applicant's petition.

---

[160] *Smith v Department of Public Health,* 428 Mich. 540 (1987).

353.   The State Defendants thus retain discretion to extend exemptions in whole or in part.   For this reason, the policy at issue is not generally applicable.

354.   The State Defendants inflicted monetary injury on Spencer by denying equal opportunity employment by operation of the CMS Vaccine Mandate.

355.   As a result, the State Defendants must prove that their policy to grant religious, medical, or bodily autonomy exemptions based on the applicant's waiver of substantive federal rights survives strict scrutiny.[161]

### *Federal Preemption*

356.   The Supremacy Clause of the United States Constitution states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.[162]

357.   The Supremacy Clause can nullify both state legislative requirements and state common law duties.[163]

358.   "[T]he purpose of Congress is the ultimate touchstone in every preemption case."[164]   Analytically relevant is "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's

---

[161] See *Fulton v Philadelphia*, 141 S. Ct. 1868 (2021).

[162] U.S. Constitution, art. VI.

[163] *Medtronic v. Lohr*, 518 U.S. 470 (1996) at 503 (Breyer, J., concurring in part and concurring in the judgment); *id.* at 510 (O'Connor, J., joined by Rehnquist, C.J., Scalia, J., and Thomas, J., concurring in part and dissenting in part); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) at 521 (plurality opinion); *id.* at 548-49 (Scalia, J., joined by Thomas, J., concurring in judgment in part and dissenting in part).

[164] *Medtronic v. Lohr*, 518 U.S. 470 (1996) at 485 *(internal quotation marks omitted)*.

reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law."[165]

> The Supremacy Clause provides that the laws and treaties of the United States "shall be the supreme Law of the land…and any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Constitution, art. VI, cl. 2. Accordingly, it has long been settled that State laws that conflict with federal law are "without effect."[166]

359.   The FDA expressly supports this conclusion in its Guidance for Industry and

Other Stakeholders regarding EUAs:

> FDA believes that the terms and conditions of an EUA issued under section 564 [21 USC § 360bbb-3] preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564….
>
> To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and conflicts with the exercise of Federal authority under [§ 564].[167]

360.   Because it requires healthcare workers to be vaccinated with an unapproved

product against their will, the CMS Vaccine Mandate is patently contrary to

---

[165] *Medtronic v. Lohr*, 518 U.S. 470 (1996) at 486 (internal citations and quotation marks omitted).

[166] *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013) at 479-80 *(citations omitted)*.

[167] See The FDA, Emergency Use Authorization of Medical Products, and other Authorities: Guidance for Industry and Other Stake Holders (January 2017), at p. 40 *(legal citations and internal quotation marks omitted)*.

both the statutory requirements and to the FDA's guidance. Thus, it is contrary to the "structure and purpose" of the statute.[168]

361.   Mandatory participation in an EUA program without informed consent is illegal.[169]

362.   CMS made clear that it intends for the CMS vaccine mandate to preempt any arguably inconsistent state and local laws.[170]

363.   The duress that Defendants are imposing on Spencer is palpable.[171]

364.   Defendants might argue that the Food, Drug, and Cosmetic Act ("FDCA") does not expressly, completely preempt the field of regulation of medical products.[172]  But that would be beside the point because cases like *Wyeth v. Levine*, 555 U.S. 555 (2009) concern the question *whether preemption under the FDCA may be raised as a defense to a claim arising under state tort law*.[173] In those cases, courts look to whether it would be "impossible for a private party to comply with both federal and state requirements,"[174] or whether, "under

---

[168] *Medtronic v. Lohr*, 518 U.S. 470 (1996) at 486.

[169] 21 USC § 360bbb-3 (III).

[170] See, *e.g.*, 86 Fed Reg. at 61,568 ("We intend . . . that this nationwide regulation preempts inconsistent State and local laws"), *at* 61,572 ("[T]his [CMS vaccine mandate] preempts the applicability of any State or local law providing for exemptions to the extent such law provides broader exemptions than provided for by Federal law and are inconsistent with this [CMS vaccine mandate]"), *at* 61,613 ("This rule would pre-empt some State laws that prohibit employers from requiring their employees to be vaccinated for COVID–19.").

[171] *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 365 (App. Div. 2nd Dept. 1977) (Duress is "when the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." Where government actors make wrongful threats precluding a Plaintiff's free will; it is duress.), quoting *Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971).

[172] *See, e.g., Wyeth v. Levine*, 555 U.S. 555 (2009).

[173] *See generally, Wyeth, id., Elliott v. Smith & Nephew*, Case No. 12-CV-0070, 2013 U.S. Dist. LEXIS 59072 (D. Idaho 4/15/2013) (discussing precedents).

[174] *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013) *at 480*.

the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[175]

365. While not all FDA pronouncements are necessarily entitled to Chevron deference,[176] agencies like the FDA "do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[177]

366. FDA's interpretation is entitled to at least some deference. As discussed above, the intent of Section 366bbb-3 is clear on its face, and the FDA's interpretation of its scope and intent, *vis a vis* federal preemption, is consistent with the statute's plain meaning.

367. Compelling state actors to mandate administration of an investigative medical product that has been made available pursuant to an EUA would impose "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[178]

---

[175] *Wyeth v. Levine*, 555 U.S. 555 (2009) at 589 (Thomas, J., concurring) (citation and internal brackets omitted). See also *Arizona v. United States*, 567 U.S. 387 (2012) at 399.
[176] *Wyeth v. Levine*, 555 U.S. 555 (2009) at 575-77
[177] *Wyeth v. Levine*, 555 U.S. 555 (2009) at 576-77.
[178] *Arizona v. United States,* 567 U.S. 387 (2012) at 399. 534.

368.    Here, the CMS Vaccine Mandate is clearly "an obstacle to the accomplishment and execution of the full purposes and objectives of" both sections 355 and 360bbb-3 of Title 21. Plainly read, the statutory scheme created by Congress was intended to allow voluntary access to experimental medical products in a public health emergency, while also protecting the right of the individual to refuse administration of the experimental product.

369.    Thus, enforcement by the State of the CMS Vaccine Mandate is preempted by federal law, rendering it "without effect."[179]

### _Failure to Enforce Anti-Commandeering Doctrine_

370.    As a precondition to receiving federal funding for THE MAPLES, WHITMER exercised first right of refusal under the Tenth Amendment by surrendering MICHIGAN's sovereign police power over the bodily autonomy of its citizens to the federal government.

371.    In his blueprint for resisting federal power, James Madison, one of the founding fathers, offered a number of actions, but most significantly, he suggested that a "refusal to cooperate with officers of the union" would impede federal overreach.

> "Should an unwarrantable measure of the federal government be unpopular in particular States, which would seldom fail to be the case, or even a warrantable measure be so, which may sometimes be the case, the means of opposition to it are powerful and at hand. The

---

[179] _Mutual Pharm. Co., Inc. v. Bartlett,_ 570 U.S. 472 (2013) at 479-80.

disquietude of the people; their repugnance and, perhaps refusal *to cooperate with officers of the Union,* the frowns of the executive magistracy of the State; the embarrassment created by legislative devices, which would often be added on such occasions, *would oppose, in any State, very serious impediments;* and were the sentiments of several adjoining States happen to be in Union, *would present obstructions which the federal government would hardly be willing to encounter."[180]*

372.    In *Prigg v. Pennsylvania 41 U.S. 539* (1842) , Justice Joseph Story held that

the federal government could not force states to implement or carry out the

Fugitive Slave Act of 1793. He said that it was a federal law, and the federal

government ultimately had to enforce it:

> "The fundamental principle applicable to all cases of this sort, would seem to be, that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is entrusted. The clause is found in the national Constitution, and not in that of any state. It does not point out any state functionaries, or any state action to carry its provisions into effect. The states cannot, therefore, be compelled to enforce them; and it might well be deemed an unconstitutional exercise of the power of interpretation, to insist that the states are bound to provide means to carry into effect the duties of the national government, nowhere delegated or entrusted to them by the Constitution."[181]

373.    In *New York v. United States,* 505 U.S. 144 (1992) the Court held that the

regulations in the Low-Level Radioactive Waste Policy Amendment Act of

1985 were coercive and violated the sovereignty of New York, holding that

"because the Act's take title provision offers the States a 'choice' between the

---

[180] Federalist #46 (Emphasis added).
[181] *Prigg v. Pennsylvania,* 41 U.S. 539 (1842) at 615.

two unconstitutionally coercive alternatives–either accepting ownership of waste or regulating according to Congress' instructions–the provision lies outside Congress' delegated powers and is inconsistent with the Tenth Amendment. **Sandra Day O'Connor** wrote for the majority in the 6-3 decision:

> As an initial matter, Congress may not simply "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program."[182]

She later expounded on this point.

> While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.[183]

374. The case *Printz v. United States, 521 U.S. 898* (1997) serves as the lynchpin for the anti-commandeering doctrine. At issue was a provision in the Brady Gun Bill that required county law enforcement officers to administer part of the background check program. Sheriffs Jay Printz and Richard Mack sued, arguing these provisions unconstitutionally forced them to administer a federal program. Justice Antonin Scalia agreed, writing in the majority opinion "it is apparent that the Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." Citing the *New York* case, the Court majority declared this

---

[182] *New York v. United States,* 505 U.S. 144 (1992).

[183] *New York v. United States,* 505 U.S. 144 (1992).

provision of the Brady Gun Bill unconstitutional, expanding the reach of the anti-commandeering doctrine.

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the States' officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.[184]

375.  In *Independent Business v. Sebelius,* 567 U.S. 519 (2012), the Court held that the federal government cannot compel states to expand Medicaid by threatening to withhold funding for Medicaid programs already in place. Chief Justice John Roberts illuminated that allowing Congress to essentially punish states that refused to go along violates constitutional separation of powers:

> The legitimacy of Congress's exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst, supra, at 17.* Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system "rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond, 564 US, at    (slip op., at 8) (quoting Alden v. Maine, 527 U.S. 706, 758 (1999)).* For this reason, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York, supra, at 162.* Otherwise, the two-government system established by the Framers would give way to a

---

[184] *Printz v. United States,* 521 U.S. 898 (1997).

system that vests power in one central government, and individual liberty would suffer.[185]

376.    In *Murphy v. NCAA,* 138 S.Ct. 1461 (2018), the Court held that Congress can't take any action that "dictates what a state legislature may and may not do" even when the state action conflicts with federal law. Justice Samuel Alito wrote, "a more direct affront to state sovereignty is not easy to imagine." He continued:

> The anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the States ... Conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority.[186]

377.    In *Pennhurst State School v. Halderman,* 451 U.S. 1 (1981) the Court held that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly."[187]

378.    Taken together and applied to the factual basis set forth above, these authoritative cases firmly establish a legal doctrine holding that the federal government has no authority to force states to participate in implementing or enforcing its CMS vaccine mandate.

---

[185] *Independent Business v. Sebelius,* 567 U.S. 519 (2012).

[186] *Murphy v. NCAA,* 138 S.Ct. 1461 (2018).

[187] *Pennhurst State School v. Halderman,* 451 U.S. 1 (1981).

## CLAIMS FOR RELIEF

379.  There is no "pandemic exception" to the law or the Constitution.[188]

380.  Where the PFIZER Defendants have acted with deliberate indifference to deny United States Constitution delegated and reserved rights, privileges, and immunities, statutory immunity is not available to them.[189]

### *Violation of Anti-Commandeering Doctrine*

381.  The Federal Defendants, jointly and severally, imposed the CMS vaccine mandate through a State, local and/or private actor to mandate nonconsensual invasive experimental medical procedure to be performed on the Posterity of the People of the United States such as it would be unlawful for the federal government to do directly.[190]

382.  Spencer suffered injury as a direct and proximate result of the acts of the Federal Defendants, jointly and severally, which were taken with intent to cause the State Defendants to enforce the CMS vaccine mandate against Spencer.

383.  The CMS vaccine mandate compels the State Defendants, jointly and severally, to administer federal regulatory programs by forcing state-run hospitals that fall under the mandate to either treat their unvaccinated employees with disparity or give up all their Medicare and Medicaid funding.

---

[188] *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020).

[189] *Smith v Department of Public Health,* 428 Mich. 540 (1987).

[190] *See, e.g., Hammerhead Enterprises, Inc. v. Brezenoff,* 707 F. 2c 33 (2d. Cir. 1983) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated.").

384.   The CMS vaccine mandate compels the State Defendants to administer federal regulatory programs by forcing state surveyors to enforce the mandate through verifying healthcare providers' compliance with it.

385.   If the State Defendants instruct their surveyors not to enforce the CMS vaccine mandate, that will result in the disqualification of Medicare- and Medicaid-certified providers and suppliers in the State of Michigan.

386.   Forcing the State Defendants to administer the CMS vaccine mandate or else jeopardize all Medicare and Medicaid funds flowing into Michigan is a gun to the head that compels the State Defendants to participate against their will.

387.   As a result, the State Defendants promulgated a mandate that deprived or threatens to deprive Spencer of his delegated rights, privileges, and immunities under the Constitution of the United States.

### *Violation of First Amendment Rights*

388.   The First Amendment to the United States Constitution states in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

389.   Spencer, in his capacity as one of the Posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes his United States Constitution delegated power under the Free Exercise Clause of the First Amendment.

390.    The PFIZER Defendants have a clear obligation to the Posterity of the People of the United States under the Free Exercise Clause of the First Amendment to disclose that PFIZER uses aborted babies in the creation of its COVID-19 vaccines.

391.    Spencer suffered injury as a direct and proximate result when the PFIZER Defendants breached their First Amendment obligation to disclose information concerning PFIZER's use of aborted babies in the creation of its COVID-19 vaccines.

392.    The PFIZER Defendants' bad faith obstruction and concealment of evidence that PFIZER used aborted babies in the creation of its COVID-19 vaccines unconstitutionally interfered with Spencer's Free Exercise Clause power delegated under the First Amendment.

393.    By denying the existence of evidence to the contrary, the PFIZER Defendants have not only committed the substantive wrong of not disclosing PFIZER's use of aborted babies in the creation of its COVID-19 vaccines, but have also taken affirmative action to knowingly obstruct justice and conceal evidence as means to interfere with the First Amendment Free Exercise Clause rights of religious objectors who seek evidentiary support to substantiate their demand of religious exemption from the CMS Vaccine Mandate.

394.   The CMS Vaccine Mandate violates the Free Exercise Clause of the First Amendment to the extent that by its ambiguity religious practice is burdened, and it is not neutral or not of typical application.   The CMS Vaccine Mandate must therefore undergo the most rigorous of scrutiny.[191]

395.   Spencer is particularly harmed by the CMS Vaccine Mandate which creates a systemic policy of violent maladministration of his Free Exercise Clause power to the extent that the State Defendants must force him to either:

    A. waive the benefit of a religious, medical, or bodily autonomy exception to the CMS Vaccine Mandate, or

    B. be treated disparately from individuals who did not seek the benefit of a religious, medical, or bodily autonomy exemption from the CMS Vaccine Mandate.

396.   Based on these facts, all Defendants, jointly and severally, did, with improper motive and/or deliberate indifference to the injuries caused to Spencer thereby, and without any objective substantial government purpose, under color of a statute, ordinance, regulation, custom or usage of the federal government, deny Spencer's substantive rights created by Michigan's Elliot Larson Act as means to further deny Spencer's constitutional rights under the Free Exercise Clause of the First Amendment.

---

[191] *Church of the LukuMichigan Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) at 542

### *Violation of Fourth Amendment Rights*

397.   The Fourth Amendment of the United States Constitution states in relevant

part that all citizens have the right "to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures[.]"

398.   Spencer, in his capacity as one of the posterity of the ratifiers of the 1787

Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of

Michigan, invokes his United States Constitution delegated power to be secure

in his person and his property under the Fourth Amendment.

399.   The Fourth Amendment controls government action that intrudes upon an

individual's reasonable expectation of privacy.[192]

400.   Spencer enjoys Fourth Amendment protected substantive liberty and

substantive property interests created by the Elliot Larson Act guarantee of

equal opportunity employment without prejudice to his fundamental rights

under the First Amendment Free Exercise Clause.

401.   Under the terms of PFIZER's contract with the U.S. ARMY (Exhibit 1) the

PFIZER Defendants have a clear Fourth Amendment duty to disclose to the

Posterity of the People of the United States that PFIZER uses aborted babies in

the creation of its COVID-19 vaccines.

---

[192] *Katz v. United States,* 389 U.S. 347 (1967) at 361.

402.   The PFIZER Defendants' bad faith obstruction and concealment of evidence that PFIZER used aborted babies in the creation of its COVID-19 vaccines unconstitutionally interfered with Spencer's power to be secure in his person delegated under the Fourth Amendment.

403.   Spencer has a reasonable expectation of privacy in his personal medical, health and genetic information.[193]

404.   "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner."[194]  "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"[195]

405.   The government's indiscriminate, mandatory surveillance testing program of all unvaccinated or "exempted" employees, regardless of symptomology or exposure, is unsupported by either individualized suspicion or sufficient special needs to justify any such intrusion into their reasonable expectations of physical and personal privacy. As such, the government's mandatory surveillance testing program violates Spencer's Fourth Amendment delegated rights.[196]

---

[193] *See Rakas et al. v. Illinois* 439 U.S. 128 (1978).

[194] *Maryland v. King*, 569 U.S. 435 (2013) at 438.

[195] *Id.*; quoting *Vernonia Sch. Distr. 47J v. Acton*, 515 U.S. 646 (1995).  In determining whether the intrusion is "reasonable," the Court has preferred "some quantum of individualized suspicion . . . [as] a prerequisite to a constitutional search or seizure."

[196] *See, e.g., B.C. v. Plumas Unified Sch. Dist.* (9th Cir. Sep. 20, 1999, No. 97-17287) 1999 U.S. App. LEXIS 38863, at *22-24.

406.    Based on these facts, all Defendants, jointly and severally, did, with

improper motive and/or deliberate indifference to the injuries caused to Spencer

thereby, and without any objective substantial government purpose, under color

of a statute, ordinance, regulation, custom or usage of the federal government,

deny Spencer's substantive liberty interests created by Michigan's Elliot Larson

Act as means to further deny Spencer's constitutional rights under the Fourth

Amendment to the United States Constitution.

### *Violation of Fifth Amendment Rights*

407.    The Fifth Amendment states in relevant part that: "No person shall be ...

deprived of life, liberty, or property, without due process of law."

408.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787

Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of

Michigan, invokes his United States Constitution delegated power to demand

substantive due process under the Fifth Amendment.

409.    Under the terms of PFIZER's contract with the U.S. ARMY (Exhibit 1) the

PFIZER Defendants have a clear Fifth Amendment obligation to publicly

disclose that PFIZER uses aborted babies in the creation of its COVID-19

vaccines.

410.    Spencer was injured as a direct and proximate result when the PFIZER

Defendants breached their Fifth Amendment obligation to disclose for

determination by the Posterity of the People of the United States of information concerning PFIZER's use of aborted babies in its vaccine program.

411.    The PFIZER Defendants' bad faith obstruction and concealment of evidence that PFIZER used aborted babies in the creation of its COVID-19 vaccines unconstitutionally interfered with Spencer's power to demand substantive due process delegated under the Fifth Amendment.

412.    A vaccine mandate policy's necessity, proportionality, reasonableness, harm avoidance and non-discrimination are determined based on the U.S. Supreme Court's landmark decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). There is reason to believe that some courts would find COVID vaccine mandates inconsistent with *Jacobson*.

413.    The Due Process Clause of the Fifth Amendment upholds the fundamental right of an individual to enjoy a meaningful opportunity to be heard before a federal benefit is denied or discontinued.

414.    The CMS vaccine mandate is rendered unconstitutionally broad by its omission of language to prohibit disparate treatment of individuals who object to being administered the COVID-19 injection. The CMS vaccine mandate is therefore patently contrary to United States law, and is therefore preempted and invalid.

415. Because the CDC's own data shows that vaccinated and unvaccinated individuals can contract COVID-19 and spread the disease, all Defendants, jointly and severally, created disparity between classes of individuals whose situations are arguably indistinguishable.

416. The CMS Vaccine Mandate is not of typical application where all Defendants, jointly and severally, treated Spencer's exercise of religious belief worse than comparable secular activities.[197]

417. All Defendants, jointly and severally, have imposed greater burdens on religious conduct than on analogous secular conduct.

418. The CMS Vaccine Mandate leaves other comparable secular actors less restricted than it does Spencer.

419. Based on these facts all Defendants, jointly and severally, did, with improper motive and/or deliberate indifference to the injuries caused to Spencer thereby, and without any objective substantial government purpose, under color of a statute, ordinance, regulation, custom or usage of the federal government, deny Spencer's substantive liberty interests created by Michigan's Elliot Larson Act as means to further deny Spencer's constitutional rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

---

[197] *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020) at 69 (Gorsuch, J. concurring).

## *Violation of Ninth Amendment Rights*

420.    The Ninth Amendment states in its entirety that: "The enumeration in the
Constitution, of certain rights, shall not be construed to deny or disparage others
retained by the people."

421.    Pursuant to the Ninth Amendment, Spencer, in his capacity as one of the
posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art.
IV § 2 citizen of the Republic of Michigan, invokes a universally recognized,
clearly established *jus cogens* right to be free from human medical
experimentation... a right that is protected by recognized international legal
standards and international treaties to which the United States is a party.

422.    The PFIZER Defendants have a non-enumerated Ninth Amendment
obligation to disclose to the Posterity of the People of the United States that
PFIZER uses aborted babies in the creation of its COVID-19 experimental
vaccines.

423.    Spencer suffered injury as a direct and proximate result when the PFIZER
Defendants breached their Ninth Amendment obligation to disclose information
concerning PFIZER's use of aborted babies in the creation of its experimental
COVID-19 vaccines.

424.    The PFIZER Defendants' bad faith obstruction and concealment of evidence
that PFIZER used aborted babies in the creation of its COVID-19 vaccines

unconstitutionally interfered with Spencer's Ninth Amendment reserved power
and *jus cogens* right to be exempt from compelled medical testing on healthy
human beings.

425.   Although it was not delegated in the Bill of Rights of 1789, the prohibition
against nonconsensual invasive experimental medical procedure being
performed on any of the Posterity of the People of the United States constitutes
a *jus cogens*[198] norm under the laws of nations.

426.   Spencer does not consent to invasive experimental medical procedure being
performed on him by means of bodily injections with substances created using
aborted babies by tortious federal contractors who are cloaked in statutory
immunity as the result of successful lobbying and congressional stock traders.

427.   Defendants cannot be permitted to continue conducting mandatory employee
experiments. The legal distinction between these experimental investigational
vaccines still in the clinical trial phase authorized by the FDA for emergency
use, versus long-established FDA-approved vaccines, is dispositive to the
vaccine mandate's illegality.

428.   Defendants' vaccine mandates are unlawful under 21 USC 360bbb-3,
*Rumsfeld #1*, *Rumsfeld #2*, international law, federal statutes, and federal
regulations as upheld in *Abdullahi v. PFIZER,* 562 F.3d 163 (2nd Cir. 2009),

---

[198] A *jus cogens* norm is a peremptory norm that permits no derogation by any nation.

and by way of example, *NJ Rev Stat* § 26:14-4 (2013), the law guarantees the illegality of medical experimentation and the right to refuse investigational new drugs that are still in the clinical trial phase, and unapproved products not licensed by the FDA for any indication administered for emergency use.

429.    Even if the FDA approves and licenses existing COVID-19 vaccines, they will remain experimental and thus subject to the international requirement that informed consent is "absolutely essential."[199]  Phase III clinical trials for the PFIZER vaccine do not end until 5/02/2023, and for the Moderna vaccine until 10/27/2022;[200] over 6000 deaths and 21,537 serious injuries have been reported after COVID vaccination to the VAERS between 12/14/2020 and 5/21/2021.

430.    The *Methodist Hospital* case and its progeny have been wrongly decided; threats of loss of employment ***ARE*** well known to be coercive.[201]

431.    The Defendants construed the omission of a constitutional prohibition against nonconsensual invasive experimental medical procedure as means to deny or disparage the non-delegated Ninth Amendment fundamental rights of Spencer against non-consensual invasive experimental medical procedure.

---

[199] Nuremberg Code, Article 1; *Addullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

[200] See also Clinical trials.

[201] *See, e.g., Am. Fed'n of State, County & Mun. Employees Council 79 v. Rick Scott*, 717 F.3d 851 (11th Cir. 2013) *at 874* ("In effect, the State is offering its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately ... To begin with, we do not agree that employees' submission to drug testing, on pain of termination, constitutes consent under governing Supreme Court case law").

432.    Based on these facts, all Defendants, jointly and severally, did, with improper motive and/or deliberate indifference to the injuries caused to Spencer thereby, and without any objective substantial government purpose, under color of a statute, ordinance, regulation, custom or usage of the federal government, deny Spencer's substantive liberty interests created by Michigan's Elliot Larson Act as means to further deny Spencer's non-delegated fundamental right to bodily autonomy guaranteed by the Ninth Amendment to the United States Constitution.

## *Violation of Tenth Amendment Rights*

433.    The structure of the United States Constitution and the text of the Tenth Amendment protect federalism by providing that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People."[202]

434.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes his constitutional power, reserved under the Tenth Amendment to the Constitution for the United States, to refuse non-consensual medical experimentation on human subjects; a *jus cogens* right which has

---

[202] US Const. Am. X.

become firmly embedded and has delegated universal acceptance in the community of nations.

435.  To establish informed consent of the Posterity of the People of the United States, the PFIZER Defendants, under PFIZER'S contract with the U.S. ARMY (Exhibit 1) have a clear Tenth Amendment obligation to disclose that PFIZER uses aborted babies in its COVID-19 vaccine program.

436.  The PFIZER Defendants acted in furtherance of a fraudulent scheme to preserve the EUA status of PFIZER's experimental vaccines by depriving Spencer of informed consent to experimental medical procedure, to wit, the PFIZER Defendants breached their Tenth Amendment obligation to disclose that PFIZER uses aborted babies in its COVID-19 vaccine program.

437.  Spencer was injured as a direct and foreseeable result of the unconstitutional acts of the PFIZER Defendants.

438.  The PFIZER Defendants' bad faith obstruction and concealment of evidence that PFIZER uses aborted babies in its COVID-19 vaccine program unconstitutionally interfered with Spencer's power to demand bodily autonomy reserved under the Tenth Amendment.

439.  A healthy individual's right to refuse invasive experimental medical procedure is a norm accepted and recognized by the international community of nations as a whole from which no derogation is permitted, and which can be

modified only by a subsequent norm of general international law having the same character.

440.  The Constitution does not delegate to the federal government the power to compel nonconsensual invasive experimental medical procedure.

441.  The federal government cannot exercise powers not delegated to it by the Constitution. The Tenth Amendment makes this absolutely clear, clarifying that powers not delegated to the federal government remain with the States respectively, or the People.

442.  The power to impose experimental vaccine mandates, to the extent that any such power exists, is a power reserved to the States respectively, or the People.

443.  WHITMER has exercised Michigan's first right of refusal under the Tenth Amendment by declining to challenge the federal government's usurpation of Michigan's constitutional police power to regulate nonconsensual invasive experimental medical procedure on healthy Americans who reside within the borders of the State of Michigan.

444.  Spencer, in his capacity as one the posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes an interest in the Tenth Amendment that is distinct from other members of the public at large.

445.   The CMS vaccine mandate seeks to exercise power far beyond that which
was delegated to the federal government by constitutional provision or
congressional action.

446.   President Biden's Executive Order and the CMS vaccine mandate were
issued in furtherance of an unconstitutional federal usurpation of State police
power over local trade and manufacture, always existing and expressly reserved
to States respectively, or the People, by virtue of the Tenth Amendment.

447.   Neither Article II of the United States Constitution nor any act of Congress
authorizes CMS to implement the CMS vaccine mandate in violation of the
Constitution.

448.   Federal economic power was abused by the Federal Defendants, jointly and
severally, in furtherance of their unconstitutional scheme to usurp Michigan's
Tenth Amendment reserved police power, and then dragooning the captured
Michigan officials to usurp Spencer's second right of refusal under the Tenth
Amendment of his non-delegated *jus cogens* right to refuse compelled
participation in nonconsensual invasive experimental medical procedure.

449.   "[T]he police power of a state" includes, above all, the authority to adopt
regulations seeking to "protect the public health," including the topic of

mandatory vaccination.[203]    These matters "do not ordinarily concern the national government."[204]

450.    The CMS experimental vaccine mandate is an unconstitutional condition on THE MAPLES' receipt of federal funds in violation of the Tenth Amendment.

451.    By interfering with the traditional balance of power between the People, States, and the Federal government, the Federal Defendants, jointly and severally, violated the Tenth Amendment structural principles of federalism by usurping the power of the States and dragooning the captured Michigan officials to overtake Spencer's second right of refusal under the Tenth Amendment of his non-delegated *jus cogens* right to refuse compelled participation in nonconsensual invasive experimental medical procedure.

452.    A natural right against compelled participation in medical testing by the Federal government may not be delegated in the Constitution, but it is considered *jus cogens* in the community of nations and is thus reserved to the States respectively, or to the People, by the Ninth Amendment and Tenth Amendment.

453.    The CMS vaccine mandate was adopted in furtherance of an unconstitutional usurpation of Tenth Amendment authority by the federal government and must be invalidated.

---

[203] *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) at 24-25.
[204] *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) *at* 38.

454.    Spencer is subject to disparate treatment since vaccinated employment
        applicants are not denied equal opportunity employment.

455.    This disparate treatment is actionable. Further, in the event that full vaccine
        licensure is granted after the time of filing. Spencer objects to the mandate as
        being illegal, experimental, and unconstitutional.

456.    Subsequent to the *Jacobson v. Massachusetts,* 197 U.S. 11 (1905)
        decision,[205] the United States Supreme Court has consistently recognized the
        Constitutional right of every nonincarcerated individual to remain free from
        forced medical treatment.[206]

457.    Courts have attempted to justify vaccination mandates by citing *Jacobson.*
        *Jacobson* was decided well before the days of strict scrutiny analysis, however
        legal scholars and public health officials on both sides continued to debate.[207]

458.    Justice Gorsuch finally knocked *Jacobson* off its perch. Justice Gorsuch
        wrote:

> Mr. Jacobson claimed that he possessed an implied "substantive due
> process" right to "bodily integrity" that emanated from the Fourteenth
> Amendment and allowed him to avoid not only the vaccine but also
> the $5 fine (about $140 today) and the need to show he qualified for
> an exemption. The Supreme Court disagreed, and over the past 115
> years, this case was precedent for hundreds of cases that followed.
> Until this Supreme Court ruling, *Jacobson* appeared to put U.S. on a

---

[205] *Jacobson v. Massachusetts, 197 U.S. 11 (1905).*
[206] *See. e.g., Cruzan v Director, Missouri Dept of Health*, 497 U.S. 261 (1990) at 279, "It cannot be disputed that the substantive Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."
[207] *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020).

predestined path towards house arrest, *aka* isolation and quarantine,
followed by mandatory vaccination for participation in society.[208]

459.    The *Jacobson* court took judicial notice of common beliefs and elevated

them to facts:

> While we do not decide and cannot decide that vaccination is a
> preventative of smallpox, we take judicial notice of the fact that this is
> a common belief of the people of the State … What everybody knows
> the court must know …[209]

> The police power of a state must be held to embrace, at least, such
> reasonable regulations established directly by legislative enactment as
> will protect the public health and the public safety. The state may
> invest local administrative bodies with authority to safeguard the
> public health and the public safety. The mode or manner is within the
> discretion of the state, subject only to the condition that no rule
> prescribed by a state, nor any regulation adopted by a local
> governmental agency acting under the sanction of state legislation,
> shall contravene the Constitution of the United States or infringe any
> right granted or delegated by that instrument. A local enactment or
> regulation must always yield in case of conflict with the exercise by
> the general government of any power it possesses under the
> Constitution, or with any right which that instrument gives or
> secures.[210]

460.    In 1905 only one vaccine was necessary (or pay a $5 fine), there was no

legal standard that the law had to pass strict scrutiny, there were no human fetal

parts in the Cowpox vaccine, there were no government mandates of up to 74

doses for children as young as six-months, there was no zero liability for

---

[208] *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020).

[209] *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) at 30.

[210] *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) at 25.

vaccine makers at the time, and cases that followed *Jacobson,* ignored the
requirement of required balancing of constitutional rights.

461.    Long before this suit was instituted, *Jacobson* had settled that it is within the
police power of a State to provide for compulsory vaccination while ignoring
constitutional limitations because the *Jacobson* Court never reached the
question of constitutional exemptions, religious or medical, to a vaccine
mandate.[211]

462.    Citing *Jacobson*: The principle that sustains compulsory vaccination is broad
enough to cover cutting the fallopian tubes.[212]   But the Court also held, that:
"The principle that sustains compulsory vaccination is broad enough to cover
cutting the fallopian tubes and that three generations of imbeciles are
enough."[213]

463.    Just as *Buck v. Bell* can no longer be followed under modern Constitutional
jurisprudence, *Jacobson* can no longer be followed under modern
Constitutional jurisprudence with the established right to privacy and autonomy
in making personal health care decisions and objections to a vaccine mandate
based on a sincerely held religious belief.

---

[211] *Zucht v. King*, 260 U.S. 174 (1922) at 174-176 (Justice Brandeis delivered the opinion of the Court).
[212] *Buck v. Bell*, 274 U.S. 200 (1927).
[213] *Buck v. Bell*, 274 U.S. 200 (1927) at 207.

464.    The *Jacobson* court took judicial notice of "a common belief of the people" *(namely, that vaccines are 'safe enough for government work')* and elevated it to 'fact'.[214]

465.    The United States Supreme Court had cautioned only three years earlier, "[i]t should ever be the care of courts of justice to guard human life and liberty against being sacrificed by public prejudice or excitement."[215]

466.    Justice Harlan's caveat on his 1905 case holding in *Jacobson* is, "There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will."[216]

467.    *Jacobson* is not a blank check to unlimited technological advancements so long as a pharmaceutical company attaches its behavior to the word "vaccine."[217]

468.    The Constitution does not delegate a power to compel the People to participate in invasive experimental medical procedure.

469.    The Tenth Amendment makes clear that non-delegated power is reserved to the States respectively, or to the People and their Posterity.

---

[214] *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) at 35. 447.
[215] *Dreyer v. Illinois.*, 187 U.S. 71 (1902) at 76.
[216] *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) at 29.
[217] *Abdullahi v. PFIZER*, 562 F.3d 163 (2nd Cir. 2009).

470.    The opportunity to obtain employment without discrimination because of religion is recognized and declared by Michigan to be a civil right[218] and thus reserved to the People under the Tenth Amendment.

471.    Based on these facts all Defendants, jointly and severally, did, with improper motive and/or deliberate indifference to the injuries caused to Spencer thereby, and without any objective substantial government purpose, under color of a statute, ordinance, regulation, custom or usage of the federal government, deny Spencer's claim of entitlement to enjoy second right to refuse exercise of bodily autonomy guaranteed by the Tenth Amendment to the United States Constitution.

## *Violation of Fourteenth Amendment*

472.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes the Fourteenth Amendment's Privileges and Immunities Clause which provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."[219]

473.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes the Fourteenth Amendment's Substantive due process

---

[218] MCL § 37.2102(1).
[219] US Const. Am. XIV.

Clause which recognizes that certain interests are so substantial that no process is enough to allow the government to restrict them absent a compelling state interest.[220]

474.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787 Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes the Fourteenth Amendment's Equal Protection Clause which recognizes that certain interests are so substantial that no process is enough to allow the government to restrict them absent a compelling state interest.[221]

475.    The State Defendants, jointly and severally have a clear obligation to Spencer under the Fourteenth Amendment not to abridge the privileges or immunities of Spencer.

476.    Spencer was injured as a direct and proximate result when the State Defendants, jointly and severally breached their Fourteenth Amendment obligation not to abridge his privileges or immunities.

477.    The above-described actions taken by the State Defendants unconstitutionally interfered with the privileges and immunities of Spencer, his rights to substantive due process and the equal protection powers delegated under the Fourteenth Amendment.

---

[220] *Washington v. Glucksberg*, 521 U.S. 702 (1997) at 719.
[221] *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591 (2008) at 601.

478.    The substantive interest in the benefit of an exemption from the CMS

Vaccine Mandate is a *"property"* interest for substantive due process purposes

because there are such rules or mutually explicit understandings that support a

claim of entitlement to the benefit which Spencer may invoke at a hearing.[222]

479.    Spencer has a fundamental right to direct his personal medical care and

medical decisions fall squarely within that liberty interest.

480.    The State Defendants are unable to demonstrate a compelling state interest

in forcibly administering the CMS Vaccine Mandate, or the forcible

administration of the CMS Vaccine Mandate lacks a rational basis, or is not

sufficiently narrowly tailored to serve a compelling state interest, because: (a)

the COVID Vaccine is experimental, as described herein, (b) the COVID

Vaccine does not prevent transmission, but only prevents serious symptoms, (c)

COVID-19 is, for Spencer and those similarly situated, far less dangerous than

seasonal influenza, (d) Spencer has a reasonable fear of suffering serious and

permanent injuries from the COVID Vaccine, (e) the adjuvant(s) used in the

COVID Vaccine is unsafe for use in humans; and/or, without limitation, (f)

adequate means exist to protect vulnerable persons without infringing on the

rights of those who do not consent to being administered the COVID Vaccine.

---

[222] *Perry v. Sindermann,* 408 U.S. 593 (1972) at 601.

481.   The harm to Spencer cannot be adequately redressed in the event that the
CMS Vaccine Mandate is carried out.

482.   The State Defendants have deprived Spencer of the right to direct his
personal medical care and medical decisions without due process, in violation
of the Fourteenth Amendment.

483.   Contrary to the Fourteenth Amendment's Due Process Clause, Spencer was
denied his First Amendment Free Exercise Clause right without substantive due
process.

484.   The Fourteenth Amendment's Equal Protection Clause addresses
governmental classifications that affect some groups of citizens differently than
others.[223]  The touchstone of this analysis is whether a State creates disparity
between    classes    of    individuals    whose    situations    are    arguably
indistinguishable.[224]

485.   The State Defendants, jointly and severally, have imposed greater burdens
on religious conduct than on analogous secular conduct.

486.   Based on these facts the State Defendants, jointly and severally, did, with
improper motive and/or deliberate indifference to the injuries caused to Spencer
thereby, and without any objective substantial government purpose, under color
of a statute, ordinance, regulation, custom or usage of the State of Michigan,

---

[223] *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591 (2008) at 601
[224] *Ross v. Moffitt*, 417 U.S. 600 (1974) at 609.

114

deny the substantive rights of Spencer which are guaranteed under the Privileges and Immunities Clause, the Due Process Clause, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## *Fraudulent Misrepresentation*

487.   The active concealment by the PFIZER Defendants that PFIZER used aborted babies in the creation of its vaccines was a moving force behind a series of events that ultimately led to the foreseeable constitutional harms inflicted on Spencer.

488.   The active bad faith concealment by the PFIZER Defendants denied Spencer direct proof from the manufacturer of the use of aborted babies in the creation of PFIZER's vaccines... *the very vaccines that he was ordered by the government to have injected into his body.*

489.   The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, which the PFIZER Defendants engaged in here with their active fraudulent concealment of the use of aborted babies in the testing and development of PFIZER's vaccines, but also by setting in motion a series of acts by others which the PFIZER Defendants knew or

reasonably should have known would cause others to inflict injury of constitutional magnitude on individuals such as Spencer.[225]

490.    The PFIZER Defendants agreed that sales of PFIZER's COVID-19 vaccine would flatline if it became known that PFIZER used **aborted babies in the** development of its vaccine.

491.    The common law of deceit subjects the PFIZER Defendants to liability for pecuniary loss caused to Spencer who was thereafter denied equal opportunity employment due to his refusal to participate in medical testing to avoid disparate treatment based upon that misrepresentation.[226]

492.    Spencer would have easily had available evidentiary support for his religious objections but for the fraudulent misrepresentations by the PFIZER Defendants.

493.    Where the joint and several actions taken by the PFIZER Defendants are a "moving force" behind a series of events that ultimately lead to a foreseeable

---

[225] See, *Johnson v. Duffy*, 588 F.2d 740 (9th Cir.1978) **at 743-44.**

[226] Restatement (Second) Torts § 525, p. 55 (1976); see also *Southern Development Co. v. Silva*, 125 U.S. 247 (1888) at 250 (setting forth elements of fraudulent misrepresentation). And the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss. See, *e. g., Pasley v. Freeman*, 3 T. R. 51, 65, 100 Eng. Rep. 450, 457 (1789) (if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action"); *Freeman v. Venner*, 120 Mass. 424, 426 (1876) (a mortgagee cannot bring a tort action for damages stemming from a fraudulent note that a misrepresentation led him to execute unless and until the note has to be paid); see also M. Bigelow, Law of Torts 101 (8th ed. 1907) (damage "must already have been suffered before the bringing of the suit"); 2 T. Cooley, Law of Torts § 348, p. 551 (4th ed. 1932) (plaintiff must show that he "suffered damage" and that the "damage followed proximately the deception").

harm, none of the PFIZER Defendants are relieved of liability on account of
intervening acts.[227]

494.   Spencer's First Amendment Free Exercise Clause delegated right to be
exempt from the federal government's nonconsensual program of invasive
experimental medical procedure is so clearly established that any reasonable
PFIZER official in such a position would have known that concealing
PFIZER's use of aborted babies in the creation of PFIZER's vaccines caused an
unconstitutional burden on the First Amendment delegated rights of Spencer.

495.   The PFIZER Defendants knowingly violated a First Amendment Free
Exercise of Religion delegated right which is so clearly established that a
reasonable official in their position would have known the conduct in question
violated the constitutional rights of Spencer.

496.   The PFIZER Defendants, motivated by unprecedented financial gains,
actively concealed PFIZER's use of aborted babies in the creation of its vaccine
with deliberate indifference to the federal Constitution delegated right of
Spencer to object to the vaccines on account of the Free Exercise Clause of the
First Amendment to the United States Constitution.

497.   The joint and several actions of the PFIZER Defendants constitute willful
misconduct where they have acted wrongfully, oppressively, or with such

---

[227] *See id*; see also *Johnson v. Duffy*, 588 F.2d 740 (9th Cir.1978) at 743; *Cabrales v. County of Los Angeles*, 864 F.2d
1454 (9th Cir.1988), vacated, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), reinstated, 886 F.2d 235 (9th
Cir.1989).

malice, which implies a spirit of mischief or criminal indifference to civil obligations.

498.    The joint and several actions of the PFIZER Defendants, constitute a "trick or contrivance intended to exclude suspicion and prevent inquiry."[228]

499.    The PFIZER Defendants acted in bad faith to make false representations to obfuscate PFIZER's use of aborted babies in the creation of its COVID-19 vaccines.

500.    The representations by the PFIZER Defendants were false when they were made.

501.    The PFIZER Defendants knew that their representations were false when they were made, or they made them recklessly, without knowing whether they were true.

502.    The fraudulent misrepresentations by the PFIZER Defendants were intended to conceal evidence which they knew would support First Amendment Free Exercise Clause objections to compulsory medical injections of substances created using aborted babies.

503.    The fraudulent misrepresentations by the PFIZER Defendants have imposed a substantial burden on  the delegated rights, privileges, and immunities of Spencer guaranteed by the United States Constitution.

---

[228] *Wood v. Carpenter*, 101 U.S. 135 (1879) at 143.

504.   The fraudulent misrepresentations by the PFIZER Defendants have caused

Spencer to suffer substantial economic and noneconomic losses.

### *Mandamus*

505.   Spencer, in his capacity as one of the posterity of the ratifiers of the 1787

Constitution, and as a U.S. Constitution art. IV § 2 citizen of the Republic of

Michigan, invokes his Fifth Amendment due process right to faithful

administration of his constitutional rights by the Federal Defendants.

506.   The Sixth Circuit, in its denial of President Biden's request for a stay of the

current national injunction stated: "Most concerning, the Property Act likely

confers no authority upon the President to order the imposition of the contractor

mandate."[229]

507.   The Federal Defendants, jointly and severally, owe Spencer a clear legal

duty to enforce the constitutional rights, privileges, and immunities of Spencer.

508.   Under the APA, a court must "hold unlawful and set aside agency action"

that is "not in accordance with law" or "in excess of statutory . . . authority . . .

or limitations, or short of statutory right."[230]

509.   The CMS Vaccine Mandate is subject to strict scrutiny.

510.   The Federal Defendants, jointly and severally, neglected the mandatory

procedure indispensable to lawful publication of the CMS Vaccine Mandate.

---

[229] *Kentucky v Biden,* 23 F 4th 585 (6th. Cir. 2022).
[230] 5 USC § 706(2)(A) & (C).

511.    The structural errors of the CMS Vaccine Mandate are clear and explicit.

512.    BECERRA's publication of the CMS vaccine mandate violated 21 C.F.R. § 50.20 which governs the administration of experimental medicine, and is thus preemptive.

513.    BECERRA's publication of the CMS vaccine mandate violated the SSA's procedural requirements.

514.    BECERRA's publication of the CMS vaccine mandate violated 42 USC § 1395z.

515.    BECERRA's publication of the CMS vaccine mandate violated APA procedural requirements.

516.    The CMS Vaccine Mandate is arbitrary, capricious, and unlawful under the APA.

517.    The CMS vaccine mandate was published pursuant to an unconstitutional exercise of authority and is therefore void.

518.    Spencer is at imminent risk of immediate harm from FDA's actions to both license and contemporaneously authorize for Emergency Use PFIZER's experimental vaccines with the cloak of statutory immunity.

519.    There is no reasonable basis to retain EUA status for other COVID vaccines for the same use and for the same population as PFIZER's Comirnaty vaccine.

520.    Where the FDA has failed to abide by its own criteria for EUA designation its decision is arbitrary and capricious and must be vacated and remanded.

521.    The CMS Vaccine Mandate is contrary to law and in excess of statutory authority because CMS's statutory rulemaking power does not include the authority to impose nonconsensual invasive experimental medical procedure.

522.    The Federal Defendants, jointly and severally, created and enforced a federal administrative policy that fails to prevent violations of law, or a policy of failure to train and educate subdivision chiefs and subordinates, where HHS acted without authority to issue an EUA without first executing its nondiscretionary, plainly defined, and purely ministerial duties described above.

523.    CMS created and enforced a federal administrative policy that fails to prevent violations of law, or a policy of failure to train and educate its executive subdivision chiefs and subordinates, where CMS acted without authority to issue the CMS Vaccine Mandate by failing to execute its nondiscretionary, plainly defined, and purely ministerial duties described above.

524.    The clear legal duty of the Federal Defendants, jointly and severally, to enforce the constitutional rights, privileges and immunities of Spencer is administrative, and thus the Federal Defendants, jointly and severally, have no discretion, and they must enforce such United States Constitution delegated and

reserved rights, privileges and immunities to the prejudice of the CMS Vaccine Mandate.

525.   The Federal Defendants, jointly and severally, are derelict in their clear legal duty to enforce the constitutional rights, privileges, and immunities of Spencer.

526.   In order to enjoy the benefit of a religious or medical exception from the CMS Vaccine Mandate, Spencer must waive numerous United States Constitution delegated and reserved substantive liberty and property interests.

527.   In order to enjoy the benefit of equal opportunity employment under the CMS Vaccine Mandate, Spencer must waive numerous substantive United States Constitution delegated substantive liberty and property interests.

528.   For the FDA to rush approval of a COVID-19 vaccine in record time, the FDA acted -- without consulting its advisory board, without answering citizen petitions, without addressing scientific concerns, and even without updating its data regarding the Delta coronavirus variant.

529.   Despite the FDA knowing that approval and licensure of such a vaccine required revoking all EUA vaccines for the same indication and knowing that revocation would risk liability exposure to vaccine makers, government actors and healthcare workers, the FDA did the impermissible by acting in violation of the unambiguous language of the EUA.

530.   The FDA "approved" a vaccine that is not widely available, playing a game

of *bait-and-switch*, and confusing the public into thinking they are getting a

vaccine with some legal remedies when in fact they are not because of the bait-

and switch.

531.   The FDA managed to do what the law forbids: "approve" a vaccine but not

revoke any EUA vaccines for the same indication.

532.   Although WOODCOCK is the acting commissioner, the fact that she did not

sign the PFIZER's licensure and EUA extension does not absolve her from

responsibility for the FDA's actions as pled herein.

533.   Once the FDA approved and licensed PFIZER's Comirnaty vaccine, there

was no further basis for the FDA to preserve the EUA status for the PFIZER

BioNTech vaccine that PFIZER acknowledges has the "same formulation" and

is "interchangeable."

534.   The COVID-19 vaccines have not been previously FDA-approved for any

use, nor have they been FDA-approved to date.

535.   By virtue of PFIZER's contract with the U.S. ARMY (Exhibit 1) the

PFIZER Defendants and the Federal Defendants, jointly and severally, have a

clear, nondiscretionary duty to administer the constitutional rights of Spencer.

536.    Spencer seeks enforcement of nondiscretionary, plainly defined, and purely ministerial duties.[231]

537.    The Federal Defendants, jointly and severally, have a clear, nondiscretionary duty to administer the constitutional rights of Spencer in good faith.

538.    Spencer seeks enforcement of the nondiscretionary, plainly defined, and purely ministerial duties demonstrated above.[232]

539.    The Federal Defendants, jointly and severally, violated the federal constitutional or statutory rights of Spencer clearly established at the time of each Federal Defendant's actions.

540.    FDA's actions to simultaneously license PFIZER's "Comirnaty" vaccine and to extend PFIZER's EUA for its vaccine that has the "same formulation" and that "can be used interchangeably" violates federal law.

541.    Spencer has a clear right to the mandamus relief requested.

542.    No other adequate remedy is available to Spencer.[233]

## *Injuries*

543.    Spencer has suffered an 'injury in fact'—an invasion of substantive liberty interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.[234]

---

[231] *See Decatur v. Paulding*, 39 U.S. (1 Pet.) 496 (1840) at 514-17; *Work v. Rives*, 267 U.S. 175 (1925) at 177; *Wilbur v. United States,* 281 U.S. 206 (1930) at 218.

[232] *See Decatur v. Paulding*, 39 U.S. (1 Pet.) 496 (1840) at 514-17; *Work v. Rives*, 267 U.S. 175 (1925) at 177; *Wilbur v. United States,* 281 U.S. 206 (1930) at 218.

[233] *Am. Hospital Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016) at 189.

544.    The physical or monetary harms suffered by Spencer readily qualify as concrete injuries under Article III.[235]

545.    The various intangible harms suffered by Spencer like reputational harms are also concrete under Article III.[236]

546.    Spencer was subjected to great humiliation, embarrassment, and mental suffering.

547.    Spencer was injured as a direct and proximate result of the fraudulent concealment of his constitutional religious objections where the PFIZER Defendants breached their obligation to publicly disclose information concerning PFIZER's use of aborted babies in its COVID-19 vaccines.

548.    There is a causal connection between the injuries and the conduct complained of where the injuries are fairly traceable to the challenged actions of all Defendants, jointly and severally, and not the result of the independent action of some third party not before the court. [237]

549.    Spencer has suffered serious noneconomic injuries where all Defendants, jointly and severally, discriminated against him by perpetuating "archaic and

---

[234] *Kentucky v Biden,* 23 F 4th 585 (6th. Cir. 2022).
[235] *Transunion LLC v. Ramirez,* 141 S.Ct 2190 (2021).
[236] *Transunion LLC v. Ramirez,* 141 S.Ct 2190 (2021).
[237] *Kentucky v Biden,* 23 F 4th 585 (6th. Cir. 2022).

stereotypic notions" or by stigmatizing him as "innately inferior" and therefore

a less-worthy participant in the community.[238]

550.   Spencer has suffered injuries of constitutional magnitude as a result of

enforcement of 42 USC § 247d–6d(b)(7) and (8) which affirmatively denies all

forum for redress of grievances against government officials that fail to execute

a clear legal duty owed to Plaintiff.

551.   It is likely, as opposed to merely speculative, that the injuries will be

redressed by a favorable decision.[239]

## *Elliot Larson Act*

552.   The Elliot Larson Act does not diminish the right of a person to direct or

immediate legal or equitable remedies in the courts.[240]

553.   The PFIZER Defendants conspired to aid, abet, incite, compel, or coerce the

State Defendants to:

    A. Violate and deny the constitutional rights of Spencer.

    B. Engage in a violation of the Elliot Larson Act.

    C. Attempt directly or indirectly to commit an act prohibited by the Elliot

      Larson Act.

---

[238] *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982) at 725.
[239] *Kentucky v Biden,* 23 F 4th 585 (6th. Cir. 2022).
[240] MCL § 37.2803.

126

    D. Willfully obstruct or prevent the State Defendants from complying with the Elliot Larson Act or an order issued, or rule promulgated under the Elliot Larson Act.

    E. Interfere with Spencer in the exercise or enjoyment of his rights granted or protected by the Elliot Larson Act.

554.    The opportunity to obtain employment without discrimination because of religion is recognized and declared by Michigan to be a civil right[241] and is thus reserved to the People under the Tenth Amendment.

555.    Spencer, in his capacity as one of the posterity of the ratifiers of the 1787 Constitution and as a U.S. Constitution art. IV § 2 citizen of the Republic of Michigan, invokes a Ninth Amendment reserved, and Republic of Michigan recognized, clearly established *jus cogens* right to obtain employment without discrimination because of religion.

556.    The State Defendants, jointly and severally, failed or refused to hire or otherwise discriminated against Spencer with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion.[242]

557.    The State Defendants, jointly and severally, limited, segregated, or classified Spencer in a way that deprives or tends to deprive an employee or applicant of

---

[241] MCL § 37.2102(1).

[242] MCL § 37.2202(1)(a).

an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion.[243]

558.    GARZA printed, emailed, or otherwise caused to be published a statement relating to employment by THE MAPLES which indicates a preference, limitation, specification, or discrimination, based on religion. (Exhibit 3).

559.    The pattern or practice of discrimination by the State Defendants prohibited by the Elliot Larson Act appears in the evidence submitted herewith.

560.    The joint and several actions of the State Defendants evince deliberately indifferent hostility to religion where there was no rational basis for denying equal opportunity employment in response to the petition of Spencer for a religious or medical exemption to the CMS vaccine mandate.

561.    The State Defendants violated the civil and religious rights, privileges, immunities, and capacities of Spencer which were diminished on account of their opinions or belief concerning matters of religion, contrary to his fundamental right of conscience.[244]

562.    The State Defendants have limited, segregated, or classified Spencer in a way that deprives or tends to deprive him of an employment opportunity, or otherwise adversely affects his status because of religion.[245]

---

[243] MCL § 37.2202(1)(b).
[244] Const.1963, Art. I, § 4.
[245] MCL § 37.2022(1)(b).

563.    The State Defendants have discriminated against Spencer because of religion; or classified him on the basis of religion; Contrary to the statute in such case made and provided and against the peace and dignity of Spencer.[246]

564.    THE MAPLES engaged in a material breach of contract concerning its covenant not to discriminate against an employee with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment because of religion; Contrary to the statute in such case made and provided and against the peace and dignity of Spencer.[247]

565.    The State Defendants, while proceeding under color of state law, subjected Spencer, or caused him to be subjected, to the deprivation of rights, privileges, or immunities delegated by the Free Exercise Clause, the Equal Protection Clause, the Substantive due process Clause, the laws of the United States of America, and the Elliot-Larson Act.

566.    The State Defendants enforced a policy that fails to prevent violations of law, or a policy of failure to train.

567.    The acts of the State Defendants violated clearly established constitutional rights of Spencer which a reasonable person would have known."[248]

---

[246] MCL § 37.2203.
[247] MCL § 37.2209.
[248] *Meals v. City of Memphis,* 493 F.3d 720 (6th Cir.2007) at 729.

129

568.    The injuries or damages suffered by Spencer are proximately caused by the acts, or a failures to act by all Defendants, jointly and severally.

569.    The joint and several acts or omissions by the State Defendants played a substantial part in bringing about or actually causing the injuries or damages to Spencer, and the injuries or damages were either a direct result, or a reasonably probable consequence of the acts or omissions.

570.    There is a connection between the joint and several actions of the State Defendants and the injuries suffered by Spencer and the occurrence which is claimed to have produced the injuries was a natural and probable result of the conduct of the State Defendants.

571.    The State Defendants have discriminated against Spencer with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion; Contrary to the statute in such case made and provided and against the peace and dignity of Spencer.[249]

572.    All Defendants have exhibited a callousness and deliberate indifference to the clearly established constitutional and statutory rights of Spencer.

573.    The State Defendants' vaccine mandate is unlawful as applied to Spencer because it violates constitutional and statutory rights, is contrary to federal law, federal precedent, and international law.

---

[249] MCL § 37.2022(1)(a).

574.   Spencer belongs to a protected class.

575.   Spencer suffered an adverse employment action by the State Defendants, jointly and severally.

576.   Spencer was qualified for the positions which he applied for.

577.   The adverse employment actions described above occurred under circumstances giving rise to an inference of unlawful discrimination."[250]

## *Concert of Action*

578.   All Defendants, jointly and severally, engaged in concerted activities described herein or by implied agreement.

579.   Spencer may not be able to identify all of the activities of these Defendants due to the generic similarity of such activities as produced and promoted by these Defendants.

580.   As a direct and proximate result of the joint and several concerted activities of all Defendants, Spencer has sustained and will continue to sustain the severe injuries set forth above.

581.   Due to the concert of action among all Defendants, each is liable to Spencer jointly and severally for these damages and injuries even if there was no direct relation to the activity conducted by that particular Defendant.

---

[250] *Sniecinski v. Blue Cross and Blue Shield of Michigan,* 666 N.W.2d 168 (2003) at 193.

582.   All Defendants, jointly and severally, are liable to Spencer for all of his
injuries or damages.

### *Conspiracy*

583.   The PFIZER Defendants illegally, maliciously, and wrongfully conspired
with one another with the intent to and for the illegal purpose of concealing the
details of PFIZER's use of aborted babies in the design and testing of its
COVID-19 products.

584.   The PFIZER Defendants, in combination, conspired to prevent general
members of the public from, as GELMAN put it, taking "this information and
us[ing] it in ways we may not want out there."  (Exhibit 2).

## COUNT I: DECLARATORY JUDGMENT

585.   Spencer incorporates the foregoing paragraphs 1-584 as though fully set
forth at length herein.

586.   WHEREFORE, Spencer respectfully asks this Court to DECLARE pursuant
to 28 USC § 2201, that:

   A. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it denies
   any forum to redress grievances submitted to the Court under the Free
   Exercise Clause of the First Amendment to the United States
   Constitution.

132

B. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it denies substantive liberty and property interests guaranteed under of the Fourth Amendment to the United States Constitution.

C. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it violates the **Substantive Due Process Clause** of the Fifth Amendment to the United States Constitution.

D. 42 USC § 247d–6d(b)(7) is unconstitutional on its face where it usurps the police power of the States reserved under the Tenth Amendment to the United States Constitution.

E. Spencer has sustained or is in immediate danger or sustaining some direct injury as a result of the enforcement of 42 USC § 247d–6d(b)(7); he does not merely suffer in some indefinite way in common with the people generally.

F. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it denies any forum to redress grievances against the government under the Free Exercise Clause of the First Amendment to the United States Constitution.

G. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it denies substantive liberty and property interests guaranteed under of the Fourth Amendment to the United States Constitution.

133

H. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it violates the **Substantive Due Process Clause** of the Fifth Amendment to the United States Constitution.

I. 42 USC § 247d–6d(b)(8) is unconstitutional on its face where it usurps the police power of the States reserved under the Tenth Amendment to the United States Constitution.

J. Spencer has sustained or is in immediate danger or sustaining some direct injury as a result of the enforcement of 42 USC § 247d–6d(b)(8); he does not merely suffer in some indefinite way in common with the people generally.

## COUNT II: FRAUDULENT MISREPRESENTATION

587. Spencer incorporates the foregoing paragraphs 1-586 as though fully set forth at length herein.

588. WHEREFORE, Spencer respectfully request that the Court:

A. Find that the PFIZER Defendants, jointly and severally, engaged in fraudulent misrepresentation to directly and proximately cause the injuries described herein.

B. Enter a judgment in favor of Spencer and against the PFIZER Defendants, jointly and severally, and award the following damages to Spencer:

(i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate Spencer for his actual, consequential, and incidental losses sustained as a result of the intentional and malicious actions of the PFIZER Defendants,

(ii) exemplary damages in an amount in excess of $10,000,000.00 resulting from the intentional and malicious actions of the PFIZER Defendants,

(iii) interests, costs, and reasonable attorney fees.

## COUNT III: DECLARATORY JUDGMENT

589. Spencer incorporates the foregoing paragraphs 1-588 as though fully set forth at length herein.

590. WHEREFORE, Spencer respectfully asks this Court to DECLARE pursuant to 28 USC § 2201, that:

A. Spencer is vested with a Ninth Amendment retained non-delegated *jus cogens* right and privilege to refuse to participate in a federal government mandated experimental invasive medical procedure.

B. Award Spencer costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT IV:  DECLARATORY JUDGMENT

591.   Spencer incorporates the foregoing paragraphs 1-590 as though fully set forth at length herein.

592.   WHEREFORE, Spencer respectfully asks this Court to DECLARE pursuant to 28 USC § 2201, that:

A. the CMS experimental vaccine mandate issued in violation of 42 USC §1395z because CMS failed to consult with appropriate state agencies.

B. the CMS vaccine mandate issued in violation of 42 USC § 1302(b)(1) because CMS failed to prepare a regulatory impact analysis.

C. the CMS experimental vaccine mandate issued in violation of the Spending Clause, the anti-commandeering doctrine, and the Tenth Amendment.

D. the COVID-19 injection, as it is being used by Defendants, is an investigational new drug within the meaning of 21 USC § 360bbb-3,

E. COVID-19 vaccines have been in "investigational new drug" status since the original investigational new drug application was filed in 2020,

F. the CMS experimental vaccine mandate is arbitrary and capricious and unlawful under the APA.

G. the CMS experimental vaccine mandate is contrary to law and in excess of statutory authority under the APA.

136

H. the federal government may not make experimental COVID-19 inoculations mandatory,

I. the FDA's orders permitting the BioNTech PFIZER Vaccine to be both under an EUA and licensed product simultaneously for the same indication are invalid.

J. the FDA's findings that the licensed Comirnaty Vaccine and the EUA BioNTech Vaccine can be used "interchangeably" or that they may be "substituted" for each other is unlawful.

K. to establish informed consent PFIZER must issue public notice that it uses aborted babies in the creation of its COVID-19 vaccines.

L. The PFIZER Defendants, jointly and severally, forfeited their statutory immunity when they acted in concert to preserve the EUA status of PFIZER's COVID-19 vaccines by concealing evidence of First Amendment Free Exercise Clause claims that would arise out of concern over PFIZER's use of aborted babies to create its vaccines.

M. The EUA mandate is vacated and remanded for further proceedings consistent with this Court's order.

N. Award Spencer costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT V: FIRST AMENDMENT

593.  Spencer incorporates the foregoing paragraphs 1-592 as though fully set forth at length herein.

594.  WHEREFORE, Spencer respectfully request that the Court:

   A.  Find that Defendants, jointly and severally, violated the rights of Spencer under the First Amendment Free Exercise Clause to directly and proximately cause the injuries described herein.

   B.  Enter a judgment in favor of Spencer and against all Defendants, jointly and severally, and award the following damages to Spencer:

   (i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate Spencer for his actual, consequential, and incidental losses sustained as a result of Defendants' intentional and malicious actions,

   (ii) exemplary damages in an amount in excess of $10,000,000.00 resulting from Defendants' joint and several intentional and malicious actions,

   (iii) interests, costs, and reasonable attorney fees.

## COUNT VI. FOURTH AMENDMENT

595.  Spencer incorporates the foregoing paragraphs 1-594 as though fully set forth at length herein.

138

596.  WHEREFORE, Spencer respectfully requests that the Court:

A.  Find that Defendants, jointly and severally, violated the Fourth Amendment substantive liberty and property interests of Spencer to directly and proximately cause the injuries described herein .

B.  Enter a judgment in favor of Spencer and against all Defendants, jointly and severally, and award Spencer the following damages:

(i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate Spencer for his actual, consequential, and incidental losses sustained as a result of Defendants' intentional and malicious actions.

(ii) exemplary damages in an amount in excess of $10,000,000.00 resulting from Defendants' intentional and malicious actions,

(iii) interests, costs, and reasonable attorney fees.

## COUNT VII: FIFTH AMENDMENT

597.  Spencer incorporates the foregoing paragraphs 1-596 as though fully set forth at length herein.

598.  WHEREFORE, Spencer respectfully requests that the Court:

A.  Declare that all Defendants, jointly and severally, violated the Fifth Amendment Equal Protection Clause right of Spencer against compelled

participation in medical testing without informed consent and without a

hearing to directly and proximately cause the injuries described herein .

B. Enter a judgment in favor of Spencer and against all Defendants, jointly

and severally, to award the following damages to Spencer:

(i) Compensatory in an amount that is in excess of $10,000.00 and

that is sufficient to compensate Spencer for his actual, consequential,

and incidental losses sustained as a result of the intentional and

malicious joint and several actions of all Defendants,

(ii) Exemplary damages in an amount in excess of $10,000,000.00

resulting from the intentional and malicious actions of all Defendants,

jointly and severally.

(iii) interests, costs, and reasonable attorney fees.

## COUNT VIII: NINTH AMENDMENT

599. Spencer incorporates the foregoing paragraphs 1-598 as though fully set

forth at length herein.

600. WHEREFORE, Spencer respectfully requests that the Court:

A. Declare that all Defendants, jointly and severally, violated the Ninth

Amendment non-delegated fundamental right of Spencer against

compelled participation in invasive experimental medical procedure to

directly and proximately cause the injuries described herein.

B. Enter a judgment in favor of Spencer and against all Defendants, jointly and severally, to award the following damages to Spencer:

(i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate Spencer for his actual, consequential, and incidental losses sustained as a result of the intentional and malicious actions of these Defendants,

(ii) Exemplary damages in an amount in excess of $10,000,000.00 resulting from the intentional and malicious actions of these Defendants,

(iii) interests, costs, and reasonable attorney fees.

## COUNT IX: TENTH AMENDMENT

601. Spencer incorporates the foregoing paragraphs 1-600 as though fully set forth at length herein.

602. WHEREFORE, Spencer respectfully requests that the Court:

A. Enter a Writ of Mandamus directing the Federal Defendants to each perform their non-discretionary constitutional duty owed to Spencer by faithfully applying the Tenth Amendment to President Biden's Executive Order and the CMS Vaccine Mandate in good faith administration of the constitutional rights of Spencer.

141

## COUNT X: FOURTEENTH AMENDMENT

603.  Spencer incorporates the foregoing paragraphs 1-602 as though fully set
forth at length herein.

604.  WHEREFORE, Spencer respectfully requests that the Court:

A. Declare that the State Defendants, jointly and severally, violated the
Fourteenth Amendment privileges and immunities of Spencer against
nonconsensual participation in medical testing without a hearing to
directly and proximately cause the injuries described herein .

B. Enter a judgment in favor of Spencer and against the State Defendants,
jointly and severally, to award the following damages to Spencer:

(i) Compensatory in an amount that is in excess of $10,000.00 and
that is sufficient to compensate Spencer for his actual, consequential,
and incidental losses sustained as a result of the intentional and
malicious actions of the State Defendants,

(ii) Exemplary damages in an amount in excess of $200,000.00
resulting from the intentional and malicious actions of the State
Defendants,

(iii) interests, costs, and reasonable attorney fees.

## COUNT XI: ELLIOT-LARSON ACT

605.  Spencer incorporates the foregoing paragraphs 1-604 as though fully set forth at length herein.

606.  WHEREFORE, Spencer respectfully request that the Court:

  A. Find that the State Defendants, jointly and severally, denied the rights of Spencer under the Elliot Larson Act.

  B. Enter a judgment in favor of Spencer and against the State Defendants jointly and severally, and award Spencer the following damages:

  (i) Compensatory in the amount of $10,000.00 and that is sufficient to compensate Spencer for his actual, consequential, and incidental losses sustained as a result of the joint and several intentional and malicious actions of the State Defendants.

  (ii) exemplary damages in an amount in excess of $30,000.00 resulting from the joint and several intentional and malicious actions of the State Defendants.

  (iii) interests, costs, and reasonable attorney fees.

## COUNT XII: CONCERT OF ACTION

607.  Spencer incorporates the foregoing paragraphs 1-606 as though fully set forth at length herein.

608.  WHEREFORE, Spencer respectfully requests that the Court:

A. Find that all Defendants, jointly and severally, acted in concert to deny federal rights with deliberate indifference to the injuries of constitutional magnitude inflicted upon Spencer.

B. Enter a judgment in favor of Spencer and against all Defendants, jointly and severally, and award Spencer the following damages:

(i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate for actual, consequential, and incidental losses sustained as a result of the joint and several intentional and malicious actions of all Defendants.

(ii) exemplary damages in an amount in excess of $10,000,000.00 resulting from the joint and several intentional and malicious actions of all Defendants.

(iii) interests, costs, and reasonable attorney fees.

## COUNT XIII: CONSPIRACY

609. Spencer incorporates the foregoing paragraphs 1-608 as though fully set forth at length herein.

610. WHEREFORE, Spencer respectfully requests that the Court:

A. Find that the PFIZER Defendants, jointly and severally, conspired to deny federal rights with deliberate indifference to the injuries of constitutional magnitude suffered by Spencer.

144

B. Enter a judgment in favor of Spencer and against the PFIZER Defendants, jointly and severally, and award Spencer the following damages:

    (i) Compensatory in an amount that is in excess of $10,000.00 and that is sufficient to compensate for actual, consequential, and incidental losses sustained as a result of the joint and several intentional and malicious actions of the PFIZER Defendants.

    (ii) exemplary damages in an amount in excess of $10,000,000.00 resulting from the joint and several intentional and malicious actions of the PFIZER Defendants.

    (iii) interests, costs, and reasonable attorney fees.

## COUNT XIV: MANDAMUS

611.   Spencer incorporates the foregoing paragraphs 1-610 as though fully set forth at length herein.

612.   WHEREFORE, Spencer respectfully requests that the Court:

A. Stay enforcement of the EUA in this matter.

B. Vacate and remand the FDA's decision to license PFIZER's Comirnaty vaccine and to extend its PFIZER-BioNTech EUA with an instruction to apply the mandatory procedures described above.

145

C. Enter a Writ of Mandamus directing the Federal Defendants, jointly and severally, to follow the mandatory administrative procedures described above before attempting to enforce the CMS Vaccine Mandate in maladministration of the constitutional rights of Spencer.

## PLAINTIFF DEMANDS A JURY TRIAL FOR ALL APPLICABLE CLAIMS.

I have read and fully understand the foregoing pleading and declare by my knowledge, except as to matters specifically identified as being alleged on information and belief, that as to those matters, I believe it to be true.

Respectfully,

W. S. Spencer
Thompsonville, Michigan.

Dated: 8/10/2022

**STATE OF MICHIGAN** )
                   ) ss.
**COUNTY OF** Benzie )

Subscribed and sworn before me this 10th Day of August 2022 at Benzonia, Michigan.

Notary Public _Benzie_ County Michigan.
My Commission expires: O4-FEB 2029

146



FROM: W. S. Spencer
PO Box 113
Copemish, MI 49625

TO:

CLERK of the Court
U. S. District Court
110 Michigan Street NW
Grand Rapids, MI 49503